THE STATE *ex rel.* THE BOARD OF COMMISSIONERS OF THE SINKING FUND *v.* JOSEPH RISTINE, Auditor of State.

PAYMENT OF INTEREST ON STATE DEBT.—Neither section 16, 1 G. & H. 650, nor section 3, 1 G. & H. 503, nor section 5 of the act of *January* 19, 1846, nor section 14, of the act of *January* 27, 1847, nor section 2, art. 10 of the Constitution of *Indiana*, nor any other subsisting law of the State, authorizes the State Officers, or any of them, to pay the interest on the State Debt, without a specific appropriation by law of the money necessary to pay the same; nor does either of said sections, or any subsisting law of the State make such appropriation.

APPEAL from the *Marion* Circuit Court.
HANNA, J.—This was a proceeding to obtain a mandate

The State ex rel. The Board of Com., &c. *v.* Ristine, Auditor, &c.

against *Ristine*, as Auditor, to compel him to issue a warrant on the Treasurer of State, to obtain the payment of the semi-annual interest upon certain parts of the public debt.

There was a demurrer sustained to the complaint. Judgment for the defendant.

The allegations in the complaint were substantially the same with those set forth in a case, at this term, between the same parties, but appearing to have been decided differently below.

Of course those to whom the interest is near due, are anxious to receive the same. The officers of State, through counsel, express themselves as anxious to pay it, if they have authority to do so. Each party asks us, without regard to mere forms and technicalities, to determine as to the power and duty of said officers, relative to such payment, under the laws now in force.

The Constitution, adopted in 1851, contains this provision: Sec. 3, Art. 10. "No money shall be drawn from the public treasury, but in pursuance of appropriations made by law."

At the time of the adoption of said section by the convention and by the people, there existed a large debt against the State, the semi-annual interest on which was more than 150,-000 dollars; payable half yearly in the city of *New York*, in pursuance of an arrangement with the bond holders, under the acts of 1846 and 1847.

To make these semi-annual payments it was necessary to get the money, in some form or manner, conveyed or transferred from the Treasury here, to the office of Agent of State, at the city of *New York*. A custom sprang up, dating from the time our debt was funded, under said acts, and continuing in an almost, if not quite, unbroken chain until 1859, by which, upon the requisition of the Agent of State, the funds were transferred to *New York*, to his control, to make said

payments, without a special appropriation having been previously made of each amount so transferred.

At the legislative session of 1857, funds were not provided, nor appropriations made, to meet said interest, and other current expenses. In the attempt to remedy this neglect of the legislative body, the executive and administrative officers, created a debt to provide the funds, and paid them out in discharge of said interest.

It is within our knowledge, as a part of the history of the State, that the acts of these officers, and the failure of the Legislature to act, provoked much comment, by which public attention was drawn to the questions involved in the controversy.

At the session of 1859, the Legislature passed an act in relation to, or providing a treasury system, by the 7th section of which, it was enacted, among other things, that, "The Treasurer of State is expressly prohibited from paying any money out of, or transferring any money from the Treasury of State, except upon the warrant of the Auditor of State." Acts 1859, p. 230. And in the 8th section it is declared that "The Auditor of State shall at no time draw a warrant upon the Treasurer of State, unless there be money in the treasury belonging to the fund, upon which the same is drawn, to pay the same, and in conformity to appropriations made by law, and on money actually in the treasury, subject to the payment of the same." *Id.*

It is evident that the provisions, thus quoted, contemplated two things: 1. To carry into full effect the section of the Constitution above quoted; and 2. To create, or at least maintain a strict system of checks upon each other in the Auditor's and Treasurer's offices, in regard to the moneys of the people entrusted to the care of said officers.

This third section of the Constitution was not self-executing; that is, whilst it might be operative upon the conscience

of the person sworn to support it; and through that channel punishment might follow a disregard of its behests, yet no temporal punishment or forfeiture was prescribed; and therefore supposed questions of overriding necessity were suffered to blind the eyes of persons to the remote consequences of a disregard of this plain provision of the fundamental law.

The statute of 1859 was not, in itself, any more binding than the constitutional provision; and, therefore, the reason of the enactment of the law of 1861, prescribing penalties and punishment for a violation of that of 1859, which was based upon the principle embodied in the Constitution. By said act of 1861, it is made a felony for an officer to convert to his own use, &c., contrary to law, any funds replaced in his care, and punished by fine, &c., and imprisonment from one to twenty-one years. And to pay out money in any other manner except as prescribed by law, the Treasurer is subject to a fine of from 50 to 500 dollars, and imprisonment not less than one year; and to use the money of one fund to pay drafts upon any other fund, subjects him to a punishment somewhat similar. And the Auditor, to draw a warrant, unless there be money in the treasury belonging to the fund drawn on, and in conformity to appropriations made by law, subjects himself to a fine of from 100 to 1000 dollars, and imprisonment from one to six months.

After the passage of the law of 1859, whatever usage and custom was growing up and maturing in regard to withdrawing money from the treasury, was at once abandoned for the plainer and less hazardous mode prescribed by the Constitution and laws.

It is manifest, upon a careful consideration of the act of 1859, that if the Treasurer of State is permitted to remove money from the treasury without first procuring authority from the Auditor, it would be impossible for the latter officer to perform his duty, for it is strictly enjoined upon him that

he "shall at no time draw a warrant upon the Treasurer of State, unless there be money in the treasury belonging to the fund upon which the same is drawn to pay the same, and in conformity to appropriations made by law."

As the moneys paid into the Treasurer's office are charged to each respective fund to which they belong in the Auditor's office, so the warrants drawn by the Auditor in favor of any person upon any one of these funds are duly registered, and therefore the Auditor can see at any time whether any balance remains in the Treasurer's hands of any particular fund to be yet disbursed—such as the Saline Fund, the Bank Tax Fund, the University Fund, the General Fund, &c.

Whatever may have been the general reason, affecting, perhaps, the structure of the Government itself, we suppose the immediate reason the Auditor was prohibited from drawing warrants for sums in fact due, but in instances where there was no money provided to pay the same, grew out of a desire to prevent such warrants from accumulating or being thrown upon the market, and thereby, perhaps, depreciating the credit of the State. All men had witnessed the depreciation, in many counties of the State, of county orders thus issued without this salutary restriction; for, in substance, a county order is a warrant drawn by the County Auditor upon the Treasurer, and the depreciation of such orders very much embarrassed the finances of many counties.

It is plain that *now*, whether a usage to the contrary ever existed or not, the legislative and administrative interpretation of our Constitution and laws prohibits the withdrawal of any money from the treasury, placed there at the expense or through the credit of the people, without an appropriation having been first made, and a warrant drawn by the Auditor.

The whole controversy resolves itself into the simple question of whether there are existing laws making *appropriations* for the payment of such interest. Such laws can only be

created by the legislative department. They can not exclu
sively grow out of any usage prevailing in either of the other
departments. Perhaps long established usage may be shown
to demonstrate the sense in which a law, previously enacted
was understood by those having the fittest opportunity of
knowing. Smith's Com. on Const. Construction, p. 348.
But upon this point it is said, "That contemporary construc-
tion is properly resorted to, to illustrate and confirm the text,
to explain a doubtful phrase, or to expound an obscure clause,
and in proportion to the uniformity of that construction, and
the known ability and talents of those by whom it is given,
is the credit to which it is entitled, it can never abrogate the
text, it can never narrow down its true meaning, it can never
enlarge its natural boundaries." Story on the Const. With
these landmarks as guides, let us look to the acts which, it is
claimed, appropriate the money to pay said interest and au-
thorize the ministerial officers to withdraw it from the treas-
ury for that purpose.

I. Is a section of the act of *January* 19, 1846, as follows:

"SEC. 5. The interest on the stock hereby created shall be
payable half yearly, at the city of *New York*, on the first days
of *January* and *July* of each year, commencing on the first
day of *July*, 1847. But if the interest for any half year shall
not be demanded before the expiration of thirteen months
from the time the same became due, it shall only be demand-
able afterwards at the treasury of the State; and for the pay-
ment of the interest and the redemption of the principal as
herein provided, the faith of the State is hereby solemnly
pledged."

II. Is the latter part of the 14th section of the act of the
27th of *January*, 1847, as follows:

"*Be it further enacted*, That all stock to be created, and all
certificates and other instruments of title to be issued in pur-
suance of the said act, and all principal, moneys and interest

thereby respectively secured, shall not be molested or impaired, arrested or attached, by the State of *Indiana*."

III. These two clauses of the acts named, it is said, were sufficient authority, and regarded as such, by those whose duty it was to guard the funds of the State, upon which to pay said interest; until the adoption of the new Constitution, which contained the following:

Sec. 2. Art. X. All the revenues derived from the sale of any of the public works belonging to the State, and from the net annual income thereof, and any surplus that may at any time remain in the treasury, derived from taxation for general State purposes, after the payment of the ordinary expenses of the Government and of the interest on bonds of the State other than bank bonds, shall be annually applied, under the direction of the General Assembly, to the payment of the principal of the public debt."

It is claimed that this section impliedly appropriates the funds in the treasury, derived from taxation for general State purposes, after the payment of the ordinary expenses of the Government; first, to the payment of this interest, and secondly, to the payment of the principal.

IV. Is the 16th section of the act of 1859, as follows:

"At some convenient period, prior to the falling due of the interest on the foreign debt of the State, payable at *New York*, the Treasurer shall, without making any discrimination, draw on the bank notes in the treasury an amount of specie sufficient to pay said interest, which he shall transmit to *New York* by express or otherwise, as may be deemed most safe; but any bank or banks on whose notes specie is thus demanded, may redeem such notes to the extent of such demand, by draft on *New York*, payable 15 days preceding the day of payment of said interest, and without any premium of exchange, and giving ample security to the Treasurer for the prompt payment thereof."

Can we say, in view of these provisions of law quoted, both fundamental and statute, in view of the usage that maintained thereunder, in view of the acts of 1859 and 1861, and of the causes that produced the same and of the change of usage thereafter, that appropriations for the payment of interest have been made by law? If we can not, then it would follow that the withdrawal of the money from the treasury, for such purpose, would subject the officer, acting in that behalf, to the penalties prescribed by the embezzlement law of 1861.

Certainly the faith of the State was pledged for the payment of the interest and, ultimately, of the principal of the funded debt, by the acts of 1846 and 1847; but was there a continuing appropriation therein, that such good faith might be maintained?

It is clear that under the present constitution, and, perhaps as fully under that which preceded it, the power to raise revenue and to control the disposition thereof after it is raised, is vested in the legislative branch of the government. We can not say but what there might be causes of very great moment, which might be considered by such branch of the government of such overruling importance as to justify the temporary suspension of the collection of any considerable amount of taxes. This might be produced by a wide spread and general famine or other calamity. Therefore, that department might desire to control the disposition of the funds in the treasury, in a direction other than towards the payment of interest on the public debt. If the argument that the acts of 1846 and 1847 should be construed as an appropriation, is given the full force claimed, it would go to the length of maintaining that such continuing appropriation became a part of the contract, or settlement with the bond holders, and not subject to the future control of the Legisla-

ture, except as involving a breach of such contract upon the part of the State.

We are of the opinion that there was not, in the acts of 1846 and 1847, an appropriation of funds necessary for the payment of the interest that might accrue in the future upon said funded debt. There was a pledge of the faith of the State that such action should be had in the future, but that, like all other human affairs, was subject to be controlled by contingencies that might intervene between the giving of such pledge and the fulfillment of its terms. The contract with the creditors of the State was consummated in view of this fallable element in human calculations.

As to the third point relied upon, we may safely say, as a general proposition, almost universal, that constitutions, fundamental laws, do not contain, nor are they intended to contain, continuing appropriations of money for specific purposes. The principles upon which taxes should be levied, revenue raised and expended, may be laid down, but such instruments do not usually descend to the particularity of making specific appropriations, to meet future contemplated indebtedness. As to the particular section of the Constitution now under consideration, it appears to have been framed as a direction to control the future disposition of any surplus that might remain in the treasury, derived from named sources, after the discharge of the ordinary expenses of the government, and payment of interest on the debt, namely, that it should be paid on the principal of said debt, that is, that it should not be risked in future, in speculations, or loaned, &c. This was the leading idea involved in said section, the disposition of the surplus. The other matters are mentioned only as incidental to the main idea.

We can not think that the parts of this section, thus incidentally placed in the Constitution, should be construed into a direct appropriation, semi-annually, of large sums. Cer-

tainly if the body of men who formed that Constitution had intended to make a binding appropriation, for years to come, they would have approached the work directly, and would not have thrown it in as a mere incident to another matter.

We come now to consider the fourth point, that is, the sixteenth section of the act of 1859, which, it is insisted, operates as an appropriation. We may say generally that it can not escape the most casual observation that the act does not profess to be an appropriation act; nor is there any language employed in this particular section that we usually find in appropriation bills. We are asked to infer that an appropriation was intended because certain other things were directed to be done by the Treasurer of State; 1st, the time was fixed that he was to do two acts, namely, obtain from the banks specie on notes in the treasury, and transmit it to *New York.* 2d. The manner in which he shall perform this duty is prescribed, namely, without "discrimination" he is to draw upon said banks for the payment of specie on said notes. This is strictly in accordance with the section immediately preceding it, which directs the Treasurer, in making disbursements, to pay out bank notes in the order of time in which they shall be received, making no discrimination in favor of any banks, &c. Why was this inserted? because, as is well known, as a part of the history of the times, there had been informal charges circulated, whether true or false we know not, that certain persons who had, before that time, been in control of the State funds, had, by virtue of their position, very much favored certain moneyed institutions in the State. This was the direction as to the manner he should obtain the necessary amount of specie—that he was forbidden to run upon one bank and lock up the circulation of another. When he had thus obtained the funds he was to transmit the same to *New York* by express or other safe mode; but no person or officer is named to whom he is to send it, nor is it directly said that

it shall be paid upon the interest on the public debt. 3d. The next part of the section is clearly for the benefit of the banks, that is, when the demand is made upon them, on the notes in the treasury, they may furnish drafts on *New York* instead of the specie upon the terms named in said section. Taking these two sections, the fifteenth and sixteenth, together, and it pretty clearly appears that the general interest, as well as the rival interests, of banks were being looked to in the enactment of said sections, about as much as the formation of a treasury system. Viewing these two sections in this light, and it is clear to us they were intended merely as directory to the Treasurer as to the mode or manner in which he should discharge his duty, when an appropriation might be made; therefore, we will examine the whole act to see whether a more extended construction ought to be placed upon the language employed, and such interpretation placed thereon as will make it an act providing for continuing appropriations. This is made necessary for, up to the passage of this act, our conclusion is that no appropriation existed. It is clearly right in the interpretation of any particular part of a statute, to look to the whole context, to the preamble, if there is one, to the title, and to the circumstances which called forth the enactment.

We have already quoted portions of the 7th and 8th sections, prohibiting the Auditor from drawing a warrant, and the Treasurer from paying or transferring the moneys in the treasury, except by virtue of appropriations made. Nevertheless, if by this sixteenth section, a legal appropriation was made, or by any other valid law, the duty of the Auditor under said eighth section would be to draw the proper warrant, &c.

Can we say, looking at the whole act, that the law makers intended, by the obscure unsatisfactory language used in said sixteenth section, to breathe into being so important a law as

that by which, every half year, over one hundred and fifty thou-sand dollars of the taxes collected from their constituents was to be transferred and paid without the limits of the State. Then let us look with care to the whole act.

The Constitution of *Indiana*, article 4, section 19, provides that "every act shall embrace but one subject and matters properly connected therewith, which subject shall be express-ed in the title." We should assume, in every instance, that legislation was had with reference to this section; and, there-fore, to find the subject of an enactment we should examine the title to such act. Here the title is "an act to provide a treasury system for the State of *Indiana*, for the man-ner of receiving, holding and disbursing the public moneys of the State, and for the safe keeping of the public moneys."

What is the leading idea here—the subject on which legis-lative wisdom was being brought to bear? It is the estab-lishment of a treasury system. Incidental to this leading idea are the minor details: 1. Of the manner in which money can get into said treasury, namely, upon the certificate and draft of the Auditor in favor of the Treasurer. See sec. 6. 2. As to holding said money, the Treasurer is expressly prohibited from loaning, using, or permitting any other person to use, deposit or exchange said money, but is to keep it in the place provided, &c. Sec. 5. 3. As to the mode of disbursing.—This we have already been considering, and is upon warrants drawn by the Auditor, payments made and receipts taken by the Treasurer. Sec. 8. 4. As to the safe keeping of said funds.—In this is included that portion of the said statute which provides for a treasury building, safes, vaults, &c.; and also the safeguard of a heavy bond to be executed by the Treasurer for the due discharge of the duties devolved upon him.

Can it be believed, considering this title with reference to the constitutional provision last quoted, that a continuing ap-

propriation of large sums, for an indefinite period of time, would be found covered up under the term "manner of disbursing the public moneys?" It appears to us that the "manner" provided for in this act was upon warrants drawn, as contra-distinguished from the manner which had before prevailed, in some instances, of removing money from the treasury; that is, disbursing it upon a requisition only.

The subject matter of this act was and is the establishment of a treasury system. The matters properly connected with that subject were, providing a place to keep said funds, and the mode in which they should be kept, and the safeguards to insure the accomplishment of that object—the manner or mode by which money should get into the treasury, and in which it should get out of the same. This was necessary, that the proper checks and balances might exist between the several persons having control and charge of said funds. Could any appropriations that might be made for any purpose, and especially for a purpose foreign to that of the establishment of the treasury system itself, be considered as a matter properly connected with said subject of legislation? To say the least of it, it is not a question beyond doubt that such legislation would be valid when brought about by the most favorable circumstances. And certainly where the whole enactment was the result of public inquiry into the acts and former mode of transacting business, in this respect, by these public officers, and was a legislative condemnation of such course, we would expect to see legislation left plain and without ambiguity, as to the duty of such officers, in the future transaction of the same business. In a word, that the circumstances which begot this legislation were such that we believe if the law-makers had intended to make appropriations by this section, running through an uncertain length of time, they would have expressed that intention in unequivocal terms. We are strengthened in this view by the fact that at

The State ex rel. The Board of Com., &c. v. Ristine, Auditor, &c.

the same session, by another act, they appropriated 640,000 dollars to pay the interest on the public debt for the years 1859 and 1860. This was approved *March* 5, 1859—Acts 1859, p. 13—four days after the act creating the treasury system, which, it is now insisted, had already made a continuing appropriation; and also by the action of the subsequent Legislature, in appropriating like sums, for the same purpose, for the years 1861 and 1862. Acts 1861, pp. 6, 7.

From these considerations, the conclusion is inevitable, that no appropriation has been made to pay said interest, and consequently the ruling of the Court below in this case was correct.

*Per Curiam.*—The judgment is affirmed, with costs.

*Frederick Rand* and *Reginald H. Hall,* for the appellant.

*Oscar B. Hord,* Attorney General, for the appellee.

In the two preceding cases, the same briefs were filed in each case by the counsel for the respective parties. The great importance of these causes will justify the repetition here of considerable portions of the able arguments of the learned counsel and of the Governor of the State.

The Attorney General, for the Auditor of State:

The appellant expressly waives all technical objections, and presents, for the consideration of the Court, the important question: Does there exist the necessary legislative appropriation to authorize the payment of the interest on the funded debt, due on the 1st day of *July* next?

The Constitution of 1816, section 21, article 3, provided that "No money shall be drawn from the treasury, but in consequence of appropriations made by law." R. S. 1843, p. 48.

The Constitution of 1851 contains a similar provision, article 10, section 3, 1 G. & H., p. 50.

Section 8 of the act creating the treasury system, provides that the Auditor of State shall draw no warrant upon the treasury, unless there be money in the fund upon which it is drawn, and in conform-

The State ex rel. The Board of Com., &c. *v.* Ristine, Auditor, &c.

ity to appropriations made by law, and on money actually in the treasury subject to the payment of the same. 1 G. & H. 647.

Section 7 of the same act provides that the Treasurer of State is expressly prohibited from paying money out of, or transferring any money from, the Treasury of State, except upon the warrant of the Auditor of State. 1 G. & H. 647.

A like provision is contained in the act of Congress of 1789, organizing the Treasury Department; and Mr. *B. F. Butler,* Attorney General, in an opinion dated *August* 2, 1836, (3 Opinions of Attorney Generals, p. 145,) speaks of it as " in exact accordance with the Constitution, and consequently impealable."

The object of the constitutional provision is very clearly stated by Mr. *Butler* in an opinion dated *November* 28, 1834. (2 Opinions, p. 670.) In commenting upon a similar provision in the Federal Constitution, he says : " The constitutional provision that ' no money shall be drawn from the treasury, except in consequence of appropriations made by law,' was undoubtedly intended to secure to the National Legislature the exclusive power of deciding how and when the public money shall be applied to the discharge of the expenses, debts, or other engagements or liabilities of the Government."

The constitutional provision gives the Legislature the entire control of the disposition of public money, and places it in their power to check the other departments of the Government in any aggressive movement upon the rights of their constituents, by enabling them to withhold the supplies that may be required to carry out acts of aggression. It also enables the people to hold to a proper accountability the public officers who have charge of the public funds ; for as no money can be drawn from the treasury but upon the authority of the Legislature, it presents a question in each case whether such authority exists.

It is not left to any public officer, however prominent his position, great his wisdom, or unquestioned his patriotism, to determine that the withdrawal of money from the treasury is necessary to the public welfare. That power, great and important as it evidently is to the preservation of liberty and the maintenance of public honesty, is left to the representatives of the people. Cases may arise in which pub-

lic injury may be sustained in consequence of this restraint; but such injury is temporary and unimportant in its character, compared with that which would result from the adoption of the rule that the public money shall be disposed of upon any other authority than that of the Legislature.

Such being the object and purpose of the constitutional provision and the statutory restraints cited, it should clearly appear that the legislative authority exists before the warrant of the Auditor is drawn. If any doubt exists, public policy requires that the money should remain in the treasury.

What is the meaning of the word *appropriation*, as used in the Constitution?

Mr. *Webster* defines it, the setting apart, by vote, of a sum of money to be expended for a given purpose.

In the case of *McConnell* v. *Wilcox*, (1 Scammon R. 359,) Smith, J., in considering the meaning of the word *appropriation*, as used in the acts of Congress relating to public lands, says: "While, on the contrary, the term 'appropriation' would imply most clearly a setting apart or application to some particular use, when applied in reference to the public revenues, it will be seen that in the Constitution of the *United States* it is used to express the disposition of the public moneys from the treasury by law. The phrase is, 'No money shall be drawn from the treasury, but in consequence of appropriations made by law.'"

He continues on page 360: "It means nothing more, in the sense in which it is used, than an application of the lands to some specific use or purpose by virtue of law, and not by any other power."

The word *appropriation*, as used in the Constitution, I suppose to mean an act of the General Assembly setting aside money to be applied to a definite purpose, with authority to take it from the treasury for application to that purpose.

I do not suppose it necessary that any set form of phraseology should be used, or that there should be a specific appropriation at each session of the General Assembly; but it should clearly appear to the Auditor and Treasurer of State that the General Assembly

The State ex rel. The Board of Com., &c. v. Ristine, Auditor, &c.

have made the appropriation authorizing the payment of the money sought to be taken from the State Treasury.

The Supreme Court, in the case of *Lange* v. *Stover*, (19 Ind., p. 175,) held that, "The statutes on the subject of swamp lands (1 G. & H., p. 597, *et seq.*) make full appropriation of the Swamp Land Fund to the payment of the legitimate claims against that fund, and no further appropriation is necessary to authorize the Auditor of State to draw his warrant in a proper case upon those funds."

The act in question creates a Swamp Land Fund, provides for a system of labor and contracting, and authorizes the Auditor of State, upon the presentation to him of a certificate showing the labor performed by a contractor, to issue a warrant to the Treasurer of State for the amount named in the certificate, payable out of the Swamp Land Fund.

This case illustrates the correctness of the definition of the word *appropriation* I have adopted.

To constitute an appropriation, money must be set aside for a definite purpose. The specific amount need not be fixed: that may be dependent upon circumstances, to be ascertained by some system of auditing. There must also be authority to take the money from the treasury for application to this purpose, for a mere setting aside of money may be for accumulation for future disposition by the Legislature: both elements must exist to constitute an appropriation.

In this connection another circumstance should be considered. A debt is contracted by the State in her sovereign and corporate capacity, and in this capacity she promises to pay. The officers of State are the mere temporary agents of the State, holding the money of the State subject to fixed legal restraints, having no power to use or dispose of the same except as directed by the Legislature. It is not for them to determine what debts of the State shall be paid, and what shall remain unpaid: they have no discretion on the subject. The power to determine such questions is left by the Constitution with the legislative department, and by its action they must be controlled.

I proceed to call the attention of the Court to the various statutory provisions supposed to bear more or less on the subject, and such other matter as I deem pertinent.

The State ex rel. The Board of Com., &c. *v.* Ristine, Auditor, &c.

The Legislature of 1846 (Acts of 1846, p. 3) made certain propositions to the creditors of the State for an adjustment of the State's indebtedness.

These propositions were substantially as follows : That whenever a creditor of the State should surrender (section 1) a bond, (except a bond issued under the original bank charter,) a new bond should be issued, specifying the amount of the principal of the bond, and, distinct from the principal, the interest upon the same, computed at the rate of two and one-half per cent. per annum, from the 1st day of *January*, 1841, to the 1st day of *January*, 1847, inclusive ; and the State proposed to pay upon the principal of said bond interest at the rate of two per cent. per annum, from the 1st day of *January*, 1847, to the 1st day of *January*, 1853, inclusive ; and that at the last mentioned date the said interest specified in the bond, and the principal, with one-half of one per cent. per annum on the principal, from the 1st day of *January*, 1847, to the 1st day of *January*, 1853, should be added together ; and the State proposed to pay two and one-half per cent. on the amount until finally redeemed.   It was further provided by section 1 : " That if the revenues of the State, up to the 1st day of *January*, 1853, to be derived from the property tax of 25 cents on every 100 dollars of value, and a poll tax of 75 cents, shall not, by reason of the taxes being paid in six per centum treasury notes, or from other causes, be sufficient, after defraying the current expenses of the Government, to pay said rate of interest of two per centum, then, and in that case, the State shall pay, up to said 1st day of *January*, 1853, such rate of interest as the par funds in the treasury, derived from the taxation aforesaid, shall enable her to do ; which shall be paid and distributed *pro rata* on the principal specified in such certificate of stock ; and the deficit, with six per centum interest per annum from the time it became due, the State shall and will make up and pay to the holders of such certificates, on or before the 1st day of *January*, 1853."

Section 5 provides, that the interest shall be paid half yearly, at the city of *New York*, on the 1st days of *January* and *July*, of each year, commencing the 1st day of *July*, 1847, and if the interest is not demanded before the expiration of 14 months from the time the same

The State ex rel. The Board of Com., &c. *v.* Ristine, Auditor, &c.

became due, it shall only be demanded afterwards at the Treasury of State.

And continues: "And for the payment of the interest, and the redemption of the principal as herein provided, the faith of the State is hereby solemnly pledged."

Section 32 provides: "It shall be optional with the State, at any time hereafter, to call in and require a surrender of the outstanding stock issued under the 1st section of this act, by giving to the holders of such stock a new certificate for the one-half of the principal thereof, to bear interest at the rate of 5 per cent. per annum, and which principal and interest shall be payable and redeemable by the State out of the revenues thereof;" the payment of the other half is provided for by the issuing of certificates payable out of canal lands, and the tolls, revenues, &c., of the canal.

The Acts of 1857, p. 3, changed the terms of the proposition embodied in the Acts of 1846, in some respects.

Section 1 provides that the State exercises the option reserved in section 32 of the Act of 1846, and required the surrender of the old bonds, proposed to issue two certificates, each for one-half of the principal secured by the bonds, to bear interest at the rate of 5 per cent. per annum, the interest to be computed from the 1st day of *January*, 1847, one to be paid by the State out of her revenues, as provided by said section 32; the other to be paid out of the canal lands, and the tolls and revenues of said canal.

Section 2 provides that certificates for the arrears of interest on the respective moities of said debt, computed from the 1st day of *January*, 1841, to the 1st day of *January*, 1847, shall be issued at the same time, and shall constitute a special stock; and proceeds: "That the amount of such of said certificates for interest as shall be chargeable on taxation as hereinbefore mentioned, shall be funded as of the 1st of *January*, 1853, and shall bear interest from that day, and not before, at and after the rate of $2\frac{1}{2}$ per cent. per annum, payable semi-annually on the 1st day of *July* and the 1st day of *January*, in every year; and the first half-yearly payment of such interest shall become due and be paid on the 1st day of *July*, 1853."

The State ex rel. The Board of Com., &c. *v.* Ristine, Auditor, &c.

Provision is then made for the payment of the interest on the other half of the debt out of the canal lands, tolls, &c.

Section 14 provides that the tolls, revenues, and profits of the said canal, &c., present and future, "and the personal taxes to be levied toward the payment of the said debt," &c., "and the receipt and application thereof for that purpose, as in the same act is also provided, shall remain and be inviolate and in full force," &c., and "shall be and continue effectual and inviolate by the means aforesaid, until the objects and purposes of the said act, and this present act shall be fully accomplished."

I have made the foregoing statement and extracts to show the na· ture of the transaction between the State and her creditors, and that the Court may see, at a glance, all the provisions of the acts of 1846 and 1847, bearing upon the question under discussion:

The State proposes to her creditors, to issue certain bonds for certain sums of money and the interest thereon, the interest to be paid semi-annnally in the city of *New York*, agrees to make a levy of 25 cents on the 100 dollars, and 75 cents on the poll, to pay the State expenses, and devote the surplus to paying interest, &c., and pledges the good faith of the State for a compliance with these provisions.

It is very evident that the acts of 1846 and 1847 contain no provision or provisions that can, by the greatest possible ingenuity or the most highly wrought effort of imagination, be supposed to amount to an appropriation, unless the agreement of the State to pay the bonds, and to levy a tax of 25 cents on the 100 dollars of property, and 75 cents on each poll, and appropriate the surplus, after paying the current expenses of the Government, to the payment of the interest, &c., have that effect.

Does a contract on the part of the State, to pay money, amount to an appropriation, and furnish authority justifying the State Officers in taking money from the State Treasury to·pay the indebtedness? An agreement on the part of the State, to pay money, is one thing, and a legislative direction to the State Officers, to take money from the treasury to pay the indebtedness another. A few illustrations will show the difference.

The *United States*, by contract with the officers and soldiers com-

The State ex rel. The Board of Com., &c. *v.* Ristine, Auditor, &c.

posing the army, agree to pay them a stipulated price per month for their services.   This contract is the contract of the Government, and is made by virtue of authority conferred by acts of Congress.

The honor of the Government is pledged for a faithful compliance with the contract, and its breach would be a lasting stain upon the national character; but I have always understood, notwithstanding this, that not a cent could be paid the army without an appropriation bill.

If the appellee is correct in her assumption that a contract to pay money is an appropriation of the money necessary to pay it, then the Federal authorities have no power to enlist a soldier for a longer period than two years; for it is expressly provided in the Constitution, as a limitation upon the right to raise and support armies, "that no appropriation to that use shall be for a longer term than two years."

The Government has, however, always acted upon a different principle, has understood that a contract to pay was not an appropriation, and therefore enlists soldiers for a longer period than two years.

The Federal Government has the power to make treaties, and may contract in them to pay money, fixing the time and place of payment; and may solemnly pledge the faith of the nation for a compliance with the obligation; yet it has always been regarded necessary that Congress should appropriate the money necessary to satisfy the obligations thus assumed.

Some light is shed upon this subject by a discussion in Congress on the 19th day of *January*, 1796, with reference to appropriations to sustain the mint, and the debate took quite a wide range.   Annals of Congress, 1795–6, p. 254.  1 Benton's Abridgment of Deb., p. 625.

*Mr. Theodore Sedgwick*, of *Massachusetts*, assumed the position that when the Government had assumed obligations, or made legal establishments, it was the duty of Congress to make the necessary appropriations to provide for them, and that Congress had not the right to refuse the appropriations, or discuss their propriety.

*Mr. Sedgwick* did not, however, take the high ground occupied by the appellee, that an obligation on the part of the Government, was itself an appropriation that rendered further action by Congress unnecessary.

*Mr. Albert Gallatin* differed from *Mr. Sedgwick,* and expressed his alarm at the position assumed. He thought that notwithstanding the obligation to pay existed, still the appropriation to meet it was for Congress and that the subject of appropriation was a solemn and important one, placed in the hands of the Legislature as a check upon the other branches of the Government, that Congress in each case had the right, and it was their duty, to determine the necessity and propriety of making an appropriation.

He referred, by way of illustration, to the fact that the military establishment was made up by enlistment, for three or more years, while it was usual to make annual appropriations for its support; and Congress was expressly prohibited, by the Constitution, from voting appropriations for more than two years for the support of an armed force.

At the time of this debate, the Government was largely in debt, had outstanding bonds, and promises to pay the interest thereon. According to the appellee's theory, these obligations constituted an appropriation of the money necessary to meet the interest, without further legislation.

*Mr. Gallatin,* in speaking of the right of the legislative branch of the Government to control appropriations, said: "There was one instance in which this House had thought it proper to abandon the right. In order to strengthen the public credit, they had consented that the payment of interest on the debt should not depend on their sole will; and they had rendered the appropriation for that object, not yearly, but a permanent one."

*Mr. Gallatin* did not think a mere promise to pay interest rendered a subsequent legislative appropriation unnecessary, but says that Congress made a permanent appropriation for that purpose.

I make the following extract from the act of Congress referred to by him, passed *August* 4, 1790—found in 1 United States Statutes at large, 139:

"Section 1. *Be it enacted,* That reserving out of the moneys which have arisen since the last day of *December* last past, and which shall hereafter arise from the duties on goods, wares, and merchandise, imported into the *United States,* and on the tonnage of ships or vessels,

the yearly sum of 600,000 dollars, or so much thereof as may be appropriated from time to time, towards the defence of the Government, of the *United States*, and their common defence, the residue of the said moneys, or so much thereof as may be necessary, as the same shall be received in each year, next after the sum reserved as aforesaid, shall be, and is hereby appropriated to the payment of the interest, which shall from time to time become due, on the loans heretofore made by the *United States*, in foreign countries; and also, the payment of interest on such further loans as may be obtained for discharging the arrears of interest thereupon, and the whole or any part of the principal thereof; to continue so appropriated until the said loans, as well those already made as those which may be made in virtue of this act, shall be fully satisfied, pursuant to the contracts relating to the same, any law to the contrary notwithstanding."

It is very evident that *Mr. Gallatin* and the Congress that passed the act of 1790, did not regard the promise of the Government to pay the interest, as sufficient for that purpose without an appropriation bill.

It will be noticed that in the section of the act of Congress cited, there is a fixed sum reserved, and all over that sum is appropriated, so that it was in the power of the treasury department to know with certainty what, if any, surplus existed for disposition as appropriated.

The agreement to appropriate what should remain of the revenue after paying the current State expenses, can not have the effect of an appropriation bill, in the absence of legislation providing for the current State expenses, for the reason that it is for the Legislature to determine the amount of the current expenses, and it can not be legally known what, if any, surplus will exist, until that is ascertained by provision being made for them.

It is claimed that a construction has been placed upon the acts of 1846 and 1847, by the uniform action of the State Officers; that under them, and without further appropriation bills, the 'interest was paid until the fall of 1858.

I admit that if it were a matter of doubt, whether the terms used in 1846 and 1847 constituted an appropriation, usage would be entitled to great consideration; but when it is perfectly clear that there

is no language used in those acts which can possibly be tortured into an appropriation, I am unable to see how a payment of interest without law, no matter how long it is continued, can create the authority necessary to its payment.

But it is not true that the interest was uniformly paid up to 1848, without an appropriation. It will be seen by an examination of the following acts, that at different times prior to that date the Legislature authorized the borrowing of money to pay the interest, and expressly appropriated the amount thus borrowed to the payment of the interest: Acts of 1848, p. 70; Acts of 1849, pp. 6, 70; Acts of 1850, p. 95; Acts of 1851, p. 132.

Thus the law stood at the formation of the Constitution of 1851. In the formation of the Constitution of 1851, the subject was deemed of such grave importance, that it was provided in section 2 of article 10, 1 G. & H. 50, that "All the revenues derived from the sale of any of the public works belonging to the State, and from the net annual income thereof, and any surplus that may at any time remain in the treasury, derived from taxation for general State purposes, after the payment of the ordinary expenses of the Government, and of the interest on the bonds of the State, other than the bank bonds, shall be annually applied, under the direction of the General Assembly, to the payment of the principal of the public debt."

It is also provided by section 5 of the same article, that no law shall authorize any debt to be contracted on behalf of the State, except in certain specified cases, among which is found "to pay the interest on the State debt." Notwithstanding these provisions, the convention realizing the importance of preventing the disbursement of public money upon any other authority than that of the General Assembly, provided in section 3 of the same article, that "No money shall be drawn from the treasury, but in pursuance of appropriations made by law."

This constitutional provision, section 2, is of course merely directory to the General Assembly, to be made effective by subsequent legislation.

The 3d section of an act entitled "An act in relation to applying certain funds therein named to the payment of the public debt," ap-

The State ex rel. The Board of Com., &c. v. Ristine, Auditor, &c.

proved *January* 18, 1852, is as follows: "That all the revenues derived from the sale of any of the public works belonging to the State, and the net annual income thereof; and any surplus that may remain in the treasury derived from taxation for general purposes, after paying the ordinary expenses of Government and interest on the State stocks, other than the original bonds not surrendered, and the State Bank bonds, be applied towards paying the principal of the State debt, as hereinafter provided." 1 G. & H., p. 503.

This section professes to dispose of any surplus there is in the State Treasury after paying the ordinary expenses of the State Government and the interest on the State debt, but it does not make appropriations for either of those purposes. The money in the treasury is first to be applied to the expenses of Government, next to the payment of the interest on the State debt, and finally to the principal of the State debt.

If this section appropriates money to pay the interest, it is equally an appropriation to pay the expenses of the State Government, and no legislation is necessary for any State expense.

If it be answered to this, that it can not have this effect, because the expenses of the State can only be ascertained by legislation; the reply is immediate and sufficient, that if the State expenses can not be ascertained because the Legislature have passed no appropriation bill, then this section can not be an appropriation of interest, for it is not to be paid until after the ordinary expenses of the State Government, and until that is ascertained, it can not be known, in any legal form, whether there will remain any money in the treasury after the ordinary expenses are paid.

This section clearly does not appropriate any money upon either of the two first mentioned objects.

Section 5 of an act entitled "An act prescribing the duties of Governor," approved *May* 27, 1852, is as follows: "The Governor, Auditor, and Treasurer of State, are hereby authorized to procure a temporary loan of money, sufficient in amount to meet the deficiency in the treasury, should any such occur, to pay the semi-annual dividends of interest on the State debt." 1 G. & H. 358.

This section makes no appropriation, but simply provides for a de-

ficiency in the State Treasury; and as no money can be taken from the treasury without an appropriation, it implies that an appropriation has been made, that there is a deficiency, and provides the mode of supplying it.

Thus the law stood when the Legislature of 1857 adjourned without making any appropriation to pay the interest on the State debt.

Governor *Willard*, feeling that it was a matter of the first importance that the contract with the bondholders should be complied with by the State, united with the Treasurer and Auditor of State in procuring a loan, with which he paid the interest on the State debt, and carried on the State Asylums.

To avoid the irregularities charged against the administration of Governor *Willard*, in the payment of the interest on the State debt for 1857, without a specific appropriation therefor, two measures were introduced into the Legislature—one an act entitled "An act to provide a treasury system for the State of *Indiana*, for the manner of receiving, holding, and disbursing the public moneys of the State, and for the safe keeping of public moneys;" the second, an act entitled "An act to provide for the safe keeping of the bonds, mortgages, and other securities entrusted to the care of certain officers herein mentioned, defining certain felonies and misdemeanors, and providing punishment therefor, and providing certain evidence on the part of the State." Both were passed, and both were vetoed by Governor *Willard*. The first was passed again, and became a law, notwithstanding the Governor's objections; (1 G. & H. 645;) the other failed for want of a quorum.

Section 8 of the act to provide a treasury system declares that " the Auditor of State shall at no time draw a warrant 'upon the Treasurer of State, unless there be money in the treasury belonging to the fund upon which the same is drawn to pay the same, and in conformity to appropriations made by law, and on money actually in the treasury, subject to the payment of the same." 1 G. & H. 647.

Section 7 of the same act provides that "the Treasurer of State is expressly prohibited from paying any money out of, or transferring any money from, the Treasury of State, except upon the warrant of the Auditor of State." 1 G. & H. 647.

The State ex rel. The Board of Com., &c. *v.* Ristine, Auditor, &c.

The second entitled act inflicted heavy penalties upon officers of State for violating the duties prescribed by law, and was substantially re-enacted by the Legislature of 1861, being the act popularly known as the Embezzlement Bill. 2 G. & H. 456.

My attention has been called to the 16th section of the act creating a Treasury System. It is as follows :

"At some convenient period, prior to the falling due of the interest on the foreign debt of the State, payable at *New York*, the Treasurer shall, without discrimination, draw on the bank notes in the treasury an amount of specie sufficient to pay said interest, which he shall transmit to *New York* by express or otherwise, as may be deemed most safe; but any bank or banks on whose notes specie is thus demanded, may redeem such notes to the extent of such demand, by draft on *New York*, payable fifteen days preceding the day of payment of said interest, and without any premium of exchange, and giving ample security to the Treasurer for the prompt payment thereof."

Attention is called, in considering this section, to the peculiar phraseology of section 7 of the same act. The Treasurer is " prohibited from paying money out of, or transferring any money from, the Treasury of State, except upon the warrant of the Auditor."

The words, " or transferring any money from the treasury," have reference to section 16—the section of the act providing for the transfer of the money to *New York* required to pay the interest.

The Treasurer can not, therefore, either pay out or transfer money from the treasury without a warrant.

Section 8 then prohibits the Auditor from issuing a warrant, except " in conformity to appropriations made by law ;" that is, he can not issue a warrant authorizing the Treasurer to pay out money, or *transfer* money, from the treasury, except in accordance with appropriations made by law.

Making a manifest distinction between the direction contained in the 16th section, to transfer the money to *New York*, and the appropriation by the Legislature, authorizing the money to be taken from the treasury for that purpose.

The interest on the State debt was payable in *New York*, and, at

the time this act was passed, there existed no statute providing the manner in which the money should be transmitted to that city, and making it the duty of any particular person to perform that service; and this section does nothing more than provide the instrumentality by which the interest shall be transmitted to the place of payment.

The bill itself is not an appropriation bill, nor is an appropriation a necessary or pertinent part of it. It is nothing more than it professes to be—an act providing the general system for receiving, holding and disbursing the public moneys of the State, to which a standing appropriation for a specific purpose would be inappropriate.

Bearing upon the effect of this section, I call your attention to the fact, that the same Legislature that enacted it, and after it had been passed, passed an appropriation bill, appropriating 320,000 dollars for interest for the year 1859, (Acts 1859, p. 13;) also, 320,000 dollars for interest for 1860, (Acts 1859, p. 14;) and that the Legislature of 1861 made similar appropriations for the years 1861 and 1862, (Acts 1861, pp. 6, 7.)

The Governor, in his argument entitled a letter to *James Winslow*, Esq., and filed herein as part of the brief of the counsel for the Commissioners :

An able lawyer has defined an appropriation as " a legal provision for the payment of a debt due from the State, or to become due, out of the funds of the State."

Another lawyer, of acknowledged ability and learning, speaks of an appropriation thus : " The term, ' appropriation made by law,' has no peculiar signification other than that there is a law requiring payments to be made out of public moneys of the State, whether the amount shall be specified in the law or left to calculation, as the amount of interest to be paid on a public debt and the quarterly payments made to our public officers where they have fixed annual salaries." These definitions are in substance the same.

An appropriation may be accurately defined as a direction given by law to pay money out of the treasury for a particular purpose. This direction may be specific, and in terms, or it may be a necessary intendment of a legislative act. If a direction to pay money is in di-

The State ex rel. The Board of Com., &c. *v.* Ristine, Auditor, &c.

rect terms, or is the necessary construction of a legislative act, it is an appropriation within the meaning of the Constitution.

. It is, as in all other cases, a question as to the intention of the Legislature, which is to be arrived at by the ordinary rules of construction. If it is the intention that money should be taken from the treasury for a particular purpose, then such intention is the law, and is an appropriation.

The act of 1846, ratifying the compromise with the creditors of the State, contains the following section:

·"Sec. 5. The interest on the stock hereby created shall be payable half-yearly, at the city of *New York*, on the first days of *January* and *July* of each year, commencing on the 1st day of *July*, 1847. But if the interest for any half-year shall not be demanded before the expiration of thirteen months from the time the same became due, it shall only be demandable afterwards at the Treasury of the State; and for the payment of the interest and the redemption of the principal, as herein provided, the faith of the State is hereby solemnly pledged."

This section solemnly pledges the faith of the State to the payment of the interest on the funded debt in the city of *New York* on the first days of *January* and *July* of each year, and is a contract of the most binding character, the faithful observance of which is vital to the credit of the State. It is a legal and necessary intendment of this contract that the money shall be drawn from the State Treasury to pay the interest.

On the 27th day of *January*, 1847, an act was approved, supplemental to the act of 1846, which was accepted by the bondholders, and became part of the contract. The concluding part of the 14th section of this act is in these words:

"*Be it further enacted*, That all stock to be created, and all certificates and other instruments of title to be issued, in pursuance of the said act, and all principal, moneys, and interest thereby respectively secured, shall not be molested or impaired, arrested or attached, by the State of *Indiana*."

I submit that it is not in the power of the Legislature to hinder or defeat the payment of the interest on the public debt by the adoption

The State ex rel. The Board of Com., &c. v. Ristine, Auditor, &c.

of new regulations, or by making such payments dependent upon uncertain legislation from year to year.

The supplemental act also provides the form of the obligation to be issued by the State to her creditors, which I quote as follows:

"$1000.                                                        No.

## UNITED STATES OF AMERICA.
### STATE OF INDIANA.
*Five Per Centum State Stock.*

"Under two acts of the General Assembly of the State of *Indiana*, entitled 'An act to provide for the funded debt of the State of *Indiana*, and for the completion of the *Wabash* and *Erie Canal* to *Evansville*,' passed 19th *January*, 1846, and 'An act supplementary to the said act,' passed ———, 1847.

"*Principal* chargeable on the revenues of the State, pursuant to acts of the Legislature of *Indiana*, passed the 19th of *January*, 1846, and ———, 1847.

"Be it known, that the State of *Indiana* owes to *A. B.*, or his assigns, the sum of 1000 dollars, being part of the principal of the bonds of the State, declared to have been surrendered to the State by act of surrender of this date, and which amount of 1000 dollars bears interest at the rate of 5 per cent. per annum, from the 1st of *January*, 1847, payable half-yearly in the city of *New York*, at the times and in the manner declared by the acts of the Legislature above mentioned.

"This stock is redeemable at any time after 20 years from 19th *January*, 1846, at the pleasure of the State, in the city of *New York*, and until redeemed is transferable upon surrender in the city of *New York*, in books provided for that purpose by the Agent of State, there resident, by endorsement hereon, and according to such other rules and forms as are or may be prescribed for that purpose; and for the payment of the interest and the redemption of the principal aforesaid, the faith of the State of *Indiana* is irrevocably pledged.

"This debt is duly recorded, &c.

"Witness our hands at *Indianapolis* the — day of ———, 1847.

"Countersigned,                                    TREASURER.
                                                    AUDITOR."

The State ex rel. The Board of Com., &c. v. Ristine, Auditor, &c.

To this obligation a postscript is attached, in these words:

"N. B.—The State reserves the right, according to the terms and conditions of the said acts, to postpone payment of a portion of the interest due upon this certificate, until *January* 1st, 1853, paying interest on the same at the rate of 6 per cent. per annum, and to fund 1 per cent. of the same without interest, after that period, at the rate of 2½ per cent."

Is it possible that further legislation is required, to authorize the State to pay the interest on this obligation? The State makes her written promise to pay at particular times, and delivers it to her creditor, which, upon presentation to the proper officer, is a direct and sufficient authority for payment. If it is not, then the promise of the State carries with it no obligation, and the authority to pay must be derived solely from subsequent legislation.

The old Constitution contained the following:

"Sec. 21, Art. 3. No money shall be drawn from the treasury, but in consequence of appropriations made by law."

The new Constitution went into force upon the 1st of *November*, 1851, and contained the following provision:

"Sec. 3, Art. 10. No money shall be drawn from the treasury, but in pursuance of appropriations made by law."

It will be seen that these provisions are in substance the same. The successive Legislatures of 1847, '48, '49, and '50, accepted the sections quoted from the acts of 1846 and '47, as an appropriation to pay interest within the meaning of the Constitution, and made no other except in three special acts in 1849, '50, and '51, authorizing the borrowing of money and directing the money thus borrowed to be paid on the interest on the public debt, which direction was nothing more than a statement of the purpose for which the money was borrowed.

The State Officers during the same period accepted them as an appropriation. The Auditor drew warrants for the necessary amounts and the treasurer paid them.

Many of the men who framed the new Constitution were in the first Legislature, that assembled under it. That Legislature did not deem it necessary to make any further appropriations to pay the interest

upon the public debt, believing that the acts of 1846 and 1847 were sufficient for the purpose. This opinion was acted upon by every Legislature up to the fall of 1858, and specific appropriations were not made before that time for the payment of interest. It was also adopted and acted upon during the same period by the Officers of State.

Thus from the beginning, the acts of 1846 and 1847 were accepted both by the Legislature and the State Officers, as a sufficient appropriation under the Constitution.

The new Constitution contains the following provision:

"Sec. 2, Art. 10. All the revenues derived from the sale of any of the public works belonging to the State, and from the net annual income thereof, and any surplus that may at any time remain in the treasury, derived from taxation for general State purposes, after the payment of the ordinary expenses of the Government, and of the interest on the bonds of the State, other than the bank bonds, shall be annually applied, under the direction of the General Assembly, to the payment of the principal of the public debt."

This provision is in itself a direct appropriation to the payment of the principal of the public debt, of all the money remaining in the treasury after the payment of the ordinary expenses of the Government, and of the interest on bonds of the State, other than bank bonds.

This appropriation, however, can not become operative until after the payment of the interest on the bonds of the State, and carries with it a necessary implication that the interest should be paid out of any money in the treasury. The Attorney General says, however, that if this section is an appropriation to pay interest, it is, also, to pay the ordinary expenses of the Government.

This does not follow, for the ordinary expenses of the Government from their nature are not liquidated, and ascertained, and can only be liquidated and determined by legislation from time to time, while the interest on the public debt is liquidated and determined in the most solemn form. If additional legal authority were required outside of the act of 1846 and the supplemental act of 1847, to pay the interest, it will be found in this provision of the Constitution.

The State ex rel. The Board of Com., &c. *v.* Ristine, Auditor, &c.

Thus, for a period of 12 years, the various Legislatures and Auditors and Treasurers of State received the acts of 1846 and 1847 as a sufficient appropriation within the meaning of both Constitutions upon which 23 semi-annual payments were made, and more than 3,000,-000 dollars disbursed. All the laws that were in force during these 12 years, are still in force, under which the interest was paid, and, after such long acquiescence and practice by Legislatures and Officers of State, it is too late to say there is no appropriation.

The treasury act of 1859, and embezzlement bill of 1861, are not broader than the Constitution. They do not make that illegal which was not illegal before. It required no more to constitute an appropriation after the passage of those bills than before. They simply affixed a punishment for paying money out of the treasury improperly, where before there was none. The simple question is, as to the existence of an appropriation, within the meaning of the Constitution, and this is conceded by the Attorney General, as he does not contend that an appropriation, good before the embezzlement bill, is not good after it. This was expressly decided in the case of *Lange, Auditor* v. *Stover*, at the *November* term, 1862, of the Supreme Court of *Indiana*, in which case it was held that the State Auditor could draw a warrant under the general appropriation contained in the swamp land act of 1852, notwithstanding the treasury act of 1859 and the embezzlement bill of 1861. Where the appropriation is general it can be paid out of any money in the treasury not otherwise appropriated; when it is special and payable out of a particular fund it must be paid only from that fund. The section quoted by the Attorney General from the act of 1859, means this and nothing more. Instances illustrating the first class may be found in the appropriations for the payment of the interest on the public debt, and the salaries of the State Officers. Instances of the second class may be found in former appropriations for the support of the benevolent institutions, at a time when a separate and specific tax was levied to raise a fund for that purpose.

At the regular session of 1859, an act was passed, entitled an act to provide a treasury system for the State of *Indiana*, for the manner

of receiving, holding and disbursing the public moneys of the State, the 16th section of which reads as follows:

"At some convenient period, prior to the falling due of the interest on the foreign debt of the State, payable at *New York*, the Treasurer shall, without making any discrimination, draw on the bank notes in the treasury an amount of specie sufficient to pay said interest, which he shall transmit to *New York* by express or otherwise, as may be deemed most safe; but any bank or banks on whose notes specie is thus demanded, may redeem such notes to the extent of such demand, by draft on *New York*, payable fifteen days preceding the day of payment of said interest, and without any premium of exchange, and giving ample security to the Treasurer for the prompt payment thereof."

It is true this section provides the manner in which the money to pay the interest on the public debt should be transmitted to *New York*; but it does more: it declares that at a convenient period before the interest falls due, which is on the first days of *January* and *July* of each year, the Treasurer shall take from the State Treasury enough money to pay such interest, and transmit the same to *New York* for that purpose. He has no discretion in the matter. The act to be performed by him is not made contingent upon future appropriations or legislation. He can be excused from its performance only by the want of money in the treasury, and in that case it is made his duty by another act of the Legislature, together with the Governor and Auditor, to borrow an amount sufficient to meet the deficit. The section constitutes an appropriation taking precedence of all others. The Treasurer is ordered to take, twice a year, enough money from the treasury to pay the interest. And how shall he escape obedience to the mandate?

It is not to be supposed that the payment of the interest upon the public debt should be left to the uncertainty of legislation from year to year, to be hindered or defeated by the accidental or willful failure of any Legislature to make an appropriation. It is eminently proper that it should have been provided for by general and continuing legislation, and not left open to the neglect or caprice of each succeeding Legislature.

The State ex rel. The Board of Com., &c. *v.* Ristine, Auditor, &c.

It is of the essential nature of such stocks that permanent provision be made for the payment of the interest; and if it were understood that the interest was not provided for, and its payment depended upon legislation from year to year, the value of our stocks in the market would be greatly diminished, and our chances for future negotiations much impaired.

The act of 1846 was regarded in that light, and the act of 1859 was intended to give increased security against failure from the neglect or errors of judgment in State officers, by making imperative the provision for sending the money to the place of payment in due season.

And so careful was the Constitutional Convention in 1850 to provide for any contingency which might result in a failure to pay the interest on the public debt, that a special provision was made in the Constitution to authorize the borrowing of money for the payment of such interest.

Section 5, article 10, of the Constitution, declares that "No law shall authorize any debt to be contracted on behalf of the State, except in the cases mentioned, of which to pay the interest on the State debt is one."

And the Legislature, at its first session under the new Constitution, carried out the provision by the following enactment, to wit:

Section 5 of an act prescribing duties of Governor, approved *May* 27, 1852, provides as follows: "The Governor, Auditor, and Treasurer of State, are hereby authorized to procure a temporary loan of money sufficient in amount to meet the deficiency in the treasury, should any such occur, to pay the semi-annual dividends of interest on the State debt."

It is a necessary construction of the above section, that if there be money in the treasury the interest shall be paid. It is predicated upon the obligation of the State punctually to pay the interest on her debt, and assumes the existence of all legislation necessary for that purpose.

*Messrs. Rand* and *Hall,* for the Commissioners, in addition to the foregoing argument of the Governor:

Has the Auditor of State authority in law to issue his warrant, a

The State ex rel. The Board of Com., &c. *v.* Ristine, Auditor, &c.

necessary preliminary step, for the payment of the interest, due *July* 1, 1863, on the public debt, created in 1846–7?

We insist that he has such authority.

In 1846 and 1847 the State, by a compromise with her creditors, issued the bonds, in the form set forth in the transcript, stipulating for the payment of the interest thereon, semi-annually, and for the payment of the principal at its maturity, solemnly pledging therefor her faith. Acts 1846, p. 3; Acts 1847, p. 3.

The new Constitution, article 10, section 2, provides that certain revenues and any surplus remaining in the treasury "shall be annually applied under the direction of the General Assembly to the payment of the principal of the public debt."

The acts 1847, p. 18, section 14, contains at its close the following: "That all stock to be created, and all certificates and other instruments of title to be issued in pursuance of the said act, and all principal moneys and interest thereby respectively secured, shall not be molested or impaired, arrested or attached by the State of *Indiana.*

The old Constitution contained, with the variance of a single word, the provision found in the new Constitution, at article 10, section 3, to-wit: "No money shall be drawn from the treasury but in pursuance of appropriations made by law."

Such were the provisions of the law at the time of, and which entered into the contract made by the State with her creditors, and represented by these bonds.

In the exercise of her undoubted right to prescribe the ministerial acts of her own officers, in the performance of her part of that contract, the Legislature has from time to time devolved upon the various members of the Executive Department new duties, and secured their fidelity by new restraints, in connection with the sacred and controlling obligation of preserving the public credit of the State.

Thus: the new Constitution, article 10, section 5: "No law shall authorize any debt to be created on behalf of the State, except in the following cases: to meet casual deficits in the revenue; to pay the interest on the State debt; to repel invasion, suppress insurrection, or, if hostilities be threatened, provide for the public defence." Showing by its location in this high catalogue, next to the duty of public

The State ex rel. The Board of Com., &c. *v.* Ristine, Auditor, &c.

defence, the elevated estimation of the duty of sustaining the State's financial integrity.

Act approved *May* 27, 1852, 1 R. S. 306: Sec. 5. "The Governor, Auditor and Treasurer of State are hereby authorized to procure a temporary loan of money sufficient in amount to meet the deficiency in the treasury, if any should occur, to pay the semi-annual dividends of interest on the State debt." This is a general act.

The treasury act, 1859, p. 230: Sec. 7. "The Treasurer of State is expressly prohibited from paying any money out of, or transferring any money from the Treasury of State, except upon the warrant of the Auditor of State," &c. Sec. 8. "The Auditor of State shall at no time draw a warrant upon the Treasurer of State unless there be money in the treasury belonging to the fund upon which the same is drawn to pay the same, and in conformity to appropriations made by law, and on money actually in the treasury subject to the payment of the same," &c. Sec. 16. "At some conveniently period, prior to the falling due of the interest on the foreign debt of the State, payable at *New York*, the treasurer shall," &c., set apart and transfer to *New York* the money necessary to pay the same. These sections of the treasury act of 1859 must be construed together, and such construction can most readily be made because it is the most natural, and plain, and consistent, preserving the whole and wresting or curtailing neither, viz : that the Auditor shall issue his warrant in order that the Treasurer may have sufficient authority to set apart and transfer from the treasury to *New York* the requisite amount, "at some convenient period prior to the falling due of the" *July* interest. Is the alleged custom of the officers of State objected to this view, viz: the transmission of the money by the Treasurer, and a subsequent issue of warrant by the Auditor? However innocent before the act of 1859, such procedure is illegal now. Witness these words of the eighth section: "*and on money actually in the treasury.*" How can such a custom be asserted in defiance of the explicit provision of law to the contrary.

It being then the duty of the Auditor to issue his warrant for the *July* interest in case there is an appropriation therefor by law, the question then arises : Do the acts of 1846 and 1847, and the consti-

tutional provisions recited, constitute a sufficient appropriation therefor?

We lay down the proposition, that in the initiation of a new power, by a public officer, all doubtful questions are to be resolved against its exercise; but when inaugurated and partly performed, then all doubts are to be construed in favor of its exercise, and this especially where good faith requires its exercise.

The acts of 1846 and 1847, above recited, provided for and inaugurated the payment of the interest on the bonds then issued; the executive officers have continuously, from 1847 to 1859, a period of twelve years, paid the interest in pursuance of the powers conferred by these acts, when there was money in the treasury, without any other or further appropriation by law. The Legislature has so regarded the sufficiency of the original appropriation; has repeatedly approved the conduct of the State officers in paying the interest, and in no instance, during that period, has it made any legislation on that subject except when there was not money enough in the treasury, and then only to authorize a loan for that purpose.

The Constitutional Convention seems to have so regarded the power, for in art. 10, sec. 2, it provides that after paying the ordinary expenses of the Government, and the interest on the State debt, the surplus shall be applied annually to the principal, "under the direction of the General Assembly." It will be seen that the annual appropriation to be made by the General Assembly applies to the surplus only, *and not to the ordinary expenses of the Government, or the interest.*

This was the view adopted by the Executive officers, Legislatures and Constitutional Convention, all doubts, if any had arisen, being consistently construed in favor of the exercise of the power by the State officers, in paying the interest in pursuance of the original appropriation.

Does the Treasury Act of 1859, or the Embezzlement Bill of 1861, alter the law and the practice in this regard?

We contend these acts do not expressly or by implication repeal any laws then in force directing or authorizing the payment of the interest on the State debt. That at the time of contracting the said

debt the law then provided for the semi-annual payment of the interest, without further legislation; that the treasury act only points out the way in which the officers designated shall perform that duty; the 8th section, limiting the Auditor in drawing his warrant, to the payment of debts "in conformity to appropriations made by law," not only future, but also previous and permanent appropriations; that the 7th section prohibits the Treasurer from paying out funds in any case, except upon the warrant of the Auditor.

Then the case stands thus: there is a general appropriation in the original contract for the payment of the interest; the money is in the treasury; it is the plain duty of the Auditor to draw his warrant upon the Treasurer for the interest; this he refuses to do, alleging a continuing ground of refusal, in the statement that there is no appropriation therefor; and a mandate is the proper remedy.

We contend further, that the laws in force and made at the time of the State's arrangement with the bondholders are to be taken together as forming a contract; that those laws provided for the semi-annual payment of the interest, when the money was in the treasury; that if the act of 1859 in any way interferes with or impedes, "molests or impairs, arrests or attaches" the payment of the "interest secured," or in any way trammels so as to postpone or defeat the payment, then it is in conflict with the Constitution of the *United States;* art. 1, sec. 10; and so far as it affects that contract detrimentally it is null and void. We refer the Court to *Scobey* v. *Gibson,* 17 Ind. 572, and the authorities there cited. The reasoning in that case we think applicable to this. Here the State is a party to a contract. Can she, by her own act of legislation, impair that contract, or lessen the rights of the bondholders in respect to the enforcement of it? If she can not do it in a case in which she is not a party, we submit she most assuredly can not where interested herself.