STATE OF NORTH DAKOTA, EX REL. LUTHER E. BIRD-ZELL, Frank E. Packard, and George E. Wallace, Members of the North Dakota Tax Commission v. CARL O. JORGENSON, as State Auditor.

(— L.R.A.(N.S.) —, 142 N. W. 450.)

**Mandamus — writ — state government — prerogatives — rights — franchises — supreme court — original jurisdiction.**

1. An application to the supreme court for a writ of mandamus directed to the state auditor, to require him to credit to the account of the state board of tax commissioners under authority of chapter 303 of the Laws of 1911, and to issue warrants upon the state treasurer to pay the salaries and meet the expenses of said commission, involves the prerogatives, rights, and franchises of the state government, and invokes the original jurisdiction of the supreme court.

**State board of tax commissioners — taxing power — state officers.**

2. The members of the state board of tax commissioners created by chapter 303 of the Laws of 1911, and who by such act have been vested with a general supervisory power over the various taxing agencies and boards of review of the state, and with the power to themselves assess in certain instances, are held to be state officers.

**Appropriation — no express words necessary.**

3. No express form of words is necessary to constitute a valid appropriation.

**Tax commissioners — salary — fixing — appropriation.**

4. Section 5 of chapter 303 of the Laws of 1911, which provides that "each of said commissioners shall receive an annual salary of $3,000, payable in the same manner that the salaries of other state officers are paid," is held to constitute a valid annual appropriation of $9,000.

**Tax commissioners — meeting — secretary — appropriation.**

5. Section 6 of chapter 303 of the Laws of 1911, which provides that "the

---

Note.—The question of the requisites of an appropriation for official salary or expenses is discussed in notes in 16 L.R.A.(N.S.) 631; 27 L.R.A.(N.S.) 537; and 22 Am. St. Rep. 640.

commissioners first appointed under this act, after having duly qualified, shall without delay meet at the capitol at Bismarck, and shall thereupon organize by electing a secretary, who shall receive a salary of not more than $2,400 per annum," is held to create a valid annual appropriation of $2,400.

## Tax commissioners — clerks — stenographers — compensation — appropriation.

6. Section 7 of chapter 303 of the Laws of 1911, which provides that "the commission may, in addition to secretary provided for in § 6 of this act, also employ such other persons as clerks, stenographers, and experts as may be necessary for the performance of the duties required of the commission. The commission shall fix the compensation of such secretary, clerks, stenographers, and experts employed by them, but the total amount expended for that purpose shall not exceed $6,000 per annum," is held to constitute a valid annual appropriation of $6,000.

## Tax commissioners — office at capitol — supplies — appropriation.

7. Section 8 of chapter 303 of the Laws of 1911, which provides that "the commission shall keep its office at the capitol, and shall be provided with suitable rooms, necessary office furniture, supplies, stationery, books, periodicals, and maps; and all necessary expenses shall be audited and paid as other state expenses are audited and paid. The commissioners, secretary, and clerks and such experts and assistants as may be employed by the commission shall be entitled to receive from the state their actual necessary expenses while traveling on business of the commission; such expenditure to be sworn to by the party who incurred the expense, and approved by the chairman of the commission, or a majority of the members of such commission, but the total amount to be expended for such office supplies and traveling expenses shall not exceed the sum of $4,500," is held to constitute a valid annual appropriation to the amount of $4,500.

## Appropriation — funds — act — purpose.

8. Section 14 of chapter 303 of the Laws of 1911, which provides that "there is hereby annually appropriated out of any funds in the state treasury not otherwise appropriated, the sum of $3,000, or as much thereof as may be needed, for the purpose of carrying out the provisions of this act," is *held* to constitute a valid annual appropriation of $3,000.

## Meaning of words — construction — intention — subject.

9. The meaning of the word "until," except when actually defined by the statute, must depend upon the intention of those using it, as manifested by the context and considered with reference to the subject to which it relates.

## Appointment — statute — construction.

10. The word "until," as found in § 3 of chapter 303 of the Laws of 1911, which provides that "if such appointment be made when the legislature is not in regular session, the appointee shall hold his office until the third Monday in

January in the next biennial session of the legislature, when if such appointment is not confirmed by the senate, the office shall become vacant," is held to include the said third Monday in January.

**Words — meaning — construction.**

11. The word "is" often has, and in this case is held to have, a future meaning. It is not synonymous with "shall have been."

**Phrases — construction — intention.**

12. The clause, "when if such appointment is not confirmed," refers to a future, and not to a past, transaction.

**Vacancy — appointment — relating to future.**

13. That portion of § 3 of chapter 303 of the Laws of 1911, which provides that "in case of vacancy, it shall be filled by appointment by the governor for the unexpired portion of the term in which such vacancy shall occur, subject to confirmation by the senate; if such appointment be made when the legislature is not in regular session, the appointee shall hold his office until the third Monday in January in the next biennial session of the legislature, when, if such appointment is not confirmed by the senate, the office shall become vacant," is *held* to relate to appointments which are made or have been made to fill vacancies in the tax commission occurring after the appointment of the first three commissioners provided for in § 2 of the act, and not to relate to the first three commissioners appointed on July 1, 1912, and under the authority of said act.

**Tax commissioners — appointment — confirmation.**

14. Sections 2, 3, and 15 of chapter 303 of the Session Laws of 1911, construed and *held* that the first three commissioners provided for by said act and under authority of § 2 thereof could legally be confirmed at any time during the legislative session of 1913, and were so legally confirmed.

Opinion filed June 17, 1913.

Mandamus by the State on relation of Luther E. Birdzell, Frank E. Packard, and Geo. E. Wallace, members of the North Dakota tax commission, against Carl O. Jorgenson, as State Auditor.

Writ allowed.

Statement by BRUCE, J.

This is an application to the supreme court for a writ of mandamus, and an appeal to its original jurisdiction. The petition has affixed to it the indorsement of the attorney general, and is as follows:

"Frank E. Packard, being first duly sworn, says that he is a duly appointed, qualified, and acting member of the tax commission of the

state of North Dakota, and makes this affidavit in behalf of himself, Luther E. Birdzell, and George E.. Wallace, who are also members of said tax commission; that during the twelfth session of the legislative assembly in and for the state of North Dakota, an act was passed and became a law, creating a nonpartisan tax commission in and for the state of North Dakota, the same being chapter 303 of the Session Laws of 1911; that under and by virtue of the provisions of said law, the petitioners were each, on the 2d day of July, 1912, duly appointed to the office of tax commissioner, said Luther E. Birdzell being appointed for a term beginning July 2, 1912, and ending the 1st Monday in May, 1915; said Frank E. Packard being appointed for a term beginning July 2d, 1912, and ending the 1st Monday in May, 1917; and the said George E. Wallace being appointed for a term beginning July 2d, 1912, and ending the 1st Monday in May, 1919; that each of said persons did thereafter, in the manner prescribed by law, duly qualify for such office, and that each of said persons still holds such office and is regularly performing the duties thereof; that during the legislative session of 1913, the appointments of each and all of said persons was confirmed by the senate, as required by law. That Carl O. Jorgenson, the defendant herein, is the duly qualified and acting state auditor of the state of North Dakota; that the petitioners herein, under and by virtue of § 5 of chapter 303 of the Session Laws of 1911, are each entitled to the salary therein provided, as members of said commission, and that the salary due to each of the petitioners for the month of April, 1913, is $250, and that the same was due and payable on the 1st day of May, 1913, under and by virtue of said § 5 of chapter 303 of the Session Laws of 1911, and that no part of said salary has been paid, nor has any warrant been issued authorizing or directing the payment of the same or any part thereof. That appropriation is made by law for the payment of said salaries by virtue of § 391 of the Revised Codes of North Dakota for 1905, and § 5 of chapter 303 of the Session Laws of 1911, and that there is money not otherwise appropriated available for the payment of said salaries; that it is the duty of the defendant herein as state auditor to draw warrants for the payment of the salaries due to the said petitioners, as herein above set forth; that each of said petitioners did demand of the defendant herein on the 1st day of May, 1913, that he issue a warrant for the payment of his salary, but that

the defendant did refuse to issue said warrants in violation of his legal duty in the premises; that said defendant still refuses to issue warrants to the petitioners herein, authorizing and directing the payment of said salaries. That from time to time, as warrants have been issued for the salaries of the said commissioners, the amounts of said warrants have been charged against the specific annual appropriation contained in § 14 of chapter 303 of the Session Laws of 1911, whereas the same are proper charges against the appropriation for the salaries of state officers, provided in § 391 of the Revised Codes of 1905. That under and by virtue of chapter 7 of the Session Laws of 1909, there is appropriated out of the general fund, $37,500 annually for the purpose of capitol maintenance, such sum being placed at the disposal of the board of trustees of public property for the purpose of providing all necessary furniture, fuel, lights, stationery, postage, express, freight, drayage, and all other supplies for the state officers and executive mansion, and the public grounds and parks connected therewith; that from time to time the tax commission has, with the approval of the board of trustees of public property, obtained stationery, postage, and express service, the bills for the same having been duly approved, audited, and paid; that the state auditor did charge the amounts of the various bills for stationery, postage, and express and other necessary supplies furnished to the tax commission against the specific $3,000 appropriation contained in said § 14 of chapter 303 of the Session Laws of 1911; that by virtue of § 8 of chapter 303 of said Session Laws of 1911, said items of expense are properly chargeable against the appropriation for capitol maintenance, found in chapter 7 of the Session Laws of 1909. That under and by virtue of chapter 186 of the Session Laws of 1907, there is appropriated out of the general fund the sum of $30,000 annually for the purpose of providing for public printing for the various state officers and departments; that from time to time printing has been supplied to the tax commission upon requisition, in regular manner as prescribed by law, and that bills for the same have been duly audited and paid and the amounts of the same have been charged by the state auditor against the specific appropriation contained in § 14 of chapter 303 of the Session Laws of 1911, whereas, under and by virtue of said § 8 of said chapter 303 of the Laws of 1911, the said charges are proper charges against the said public printing appropriation contained in

chapter 186 of the Session Laws of 1907. That from time to time, as required by law, the state auditor has issued his warrant, directing the payment of the salaries of employees of the tax commission, and that the same have been paid in regular course, and that the amounts of the various warrants issued for this purpose have been charged to the specific annual appropriation of $3,000 contained in § 14 of chapter 303 of the Session Laws of 1911, whereas the same are a proper charge against the specific appropriation of $6,000 per annum provided in § 7 of the said chapter 303 of the Session Laws of 1911. That the petitioners herein have requested the said Carl O. Jorgenson, as state auditor, to correct his accounts in so far as they pertain to various charges for salaries of the petitioners, secretary, stenographers, and clerks, postage, expressage, traveling expenses, printing, and other supplies, and also, in so far as the said accounts pertain to the crediting of the appropriations to the end that the account be properly stated by him, the said Carl O. Jorgenson, as state auditor, as he is required by law to do; that notwithstanding his duty in the premises, the said Carl O. Jorgenson has refused and still refuses to properly enter said charges and credits, as aforesaid. As special reasons for invoking the original jurisdiction of this court, affiant represents and alleges as follows: That the defendant herein has recently announced his refusal to abide by and follow the opinion of the attorney general to the effect that the salaries of the petitioners are appropriated over and above the $3,000 annual appropriation contained in § 14 of said chapter 303 of the Session Laws of 1911, and that he has consequently refused to credit the account of the tax commission with the amount of said salaries for the year 1913, as was done by his predecessor in office for the semiannual period preceding; that all expense of every kind and character, including salaries of the petitioners herein, employees, printing, postage, books, pamphlets, maps, stationery, records, typewriters, traveling expenses of the members of the commission, and other necessary and incidental expenses of said tax commission, have been charged by this defendant against the appropriation of $3,000 provided by § 14 of said chapter 303 of the Session Laws of 1911, and that the defendant herein refuses to credit the tax commission account with appropriations provided by law; and as a result of the wrongful conduct of the defendant, said appropriation of $3,000 has been exhausted, and no further funds are available, either

for salaries or expenses, with which to conduct said tax commission, and said tax commission is without any funds to enable it to carry out and perform the duties imposed upon it by statute, and that the governmental objects sought to be obtained by the establishment of said commission are rendered impossible of attainment, and are being held in abeyance, and defeated by virtue of said wrongful violation of duty of the defendant herein; that the defendant herein, as state auditor, contends that there is no appropriation for the carrying on of the work of the tax commission and for the fulfilling of the purposes for which the commission was created other than the appropriation of $3,000 named in § 14 of said chapter 303 of the Laws of 1911.  That it is essential to the efficient conduct of the work of the tax commission that all obstructions to the prosecution of its work be removed as speedily as possible, if removed at all, for the reasons, among others, to wit:  That said tax commission is given power to exercise general supervision over the administration of assessments, boards of review, and boards of equalization, to the end that all assessments of property may be relatively just and equal; to confer with, advise, and direct assessors and boards of review and equalization as to their duties; to review assessments as made by different assessors and as equalized by county boards of equalization, and to order reassessments of property where assessments made seem grossly unjust; that in fulfilling the duties devolving upon the commission in respect to assessments, reassessments, and reviews, the commission has issued instructions to assessors, and the proper exercise of its functions requires that it follow up such instructions with additional instructions to boards of review and equalization, and, where deemed necessary, upon complaint, to order reassessments of property and conduct the same; that the assessments throughout the state are now in process of being made, and that, should this commission be without further funds to prosecute the work, its powers hereinbefore enumerated will be rendered wholly nugatory for the assessment of 1913.  That it is the duty of the tax commission to assess light, heat, and power companies throughout the state, and there is no other provision of law now existing, authorizing the assessment of such property; that the commission has taken the preliminary steps necessary to make this assessment for the year 1913, and if without funds to further prosecute its work, such assessment cannot be carried out.  That important administrative

25 N. D.—35.

functions are vested in the tax commission, under chapter 185 of the Session Laws of 1913, known as the inheritance tax law; that a protracted interruption of the work of the tax commission will hazard the revenues of the state, and will prevent a just and efficient administration of the aforesaid inheritance tax law. That it is made the duty of the tax commission to conduct investigations throughout the state for the purpose of ascertaining the relative tax burdens by all kinds of property within the state; that in performing its duties in this connection, investigations are in progress that require continuity in the prosecution thereof in order to attain the ends sought to be accomplished by this statute and the laws of the state. That the proper and efficient performance of the official duties devolving upon the petitioners requires that they travel from place to place within the state to investigate, confer with, and direct various taxing officials in the performance of their duties, and that as a result of the said wrongful action of the said Carl O. Jorgenson as state auditor, the petitioners are without funds to enable them to so perform their duties. That the duties above enumerated, and other duties which the court can readily ascertain by reference to the aforesaid chapter 303 of the Session Laws of 1911, will be held in abeyance, and an important department of state government rendered wholly inoperative for such period of time as may elapse before a final determination of the matters involved in this application. That your petitioners respectfully represent that judgment of this court upon this application involves the prerogatives, rights, and franchises of the sovereign state of North Dakota, and is a matter affecting the interests of all the people of the state, and that there is not a plain, speedy, and adequate remedy in the ordinary course of law available to compel the issuance of said warrants, and the crediting of the account of the tax commission with appropriations made by law; wherefore, affiant in behalf of himself and the other said members of the tax commission, prays this honorable court that a writ of alternative mandamus may be issued out of and under the seal of this court, directed to said Carl O. Jorgenson, as state auditor, commanding him forthwith to issue warrants in the sum of $250 each to the petitioners herein in payment of their salary for the month of April, 1913, and charge the same to the appropriation for the salary of the state officers, under § 391 of the Revised Codes of 1905, and that he credit the account of the tax commission for the

year 1913 with the amount of $6,000, subject to expenditure by the tax commission for salaries of secretary, clerks, stenographers, and experts, and that he credit the account of the tax commission with $4,500, subject to expenditures by the tax commission for office supplies and traveling expenses, or, in default of his full compliance therewith, that he show cause before your honorable court, at such time as may be fixed by the court, why he has not done so, and that your honorable court may enter such other judgment or order as may be proper in the premises to the end that the petitioners herein may have such relief as they are by law entitled to receive.

An alternative writ was granted and the following answer made:

"The defendant, Carl O. Jorgenson, for the return to the alternative writ of mandamus, avers that he is, and ever since about the 9th day of January, 1913, has been, the duly elected, qualified, and acting state auditor of the state of North Dakota. That on or about the 2d day of July, 1912, the plaintiffs herein were appointed by the governor of the state of North Dakota as members of such commission; that said tax commission was created, and provision for its maintenance was made, by the act of the twelfth legislative assembly of the state of North Dakota, which was approved March 17, 1911, which act is known and designated as chapter 303 of the Session Laws of this state for the year 1911, and entitled: 'An Act to Create a Permanent Nonpartisan Tax Commission, Defining Its Powers and Duties and Making an Appropriation for the Maintenance thereof.' That in and by the terms of said act, as found in § 14 thereof the appropriation referred to in the title was made in the words and figures following, to wit: 'There is hereby annually appropriated out of any moneys in the state treasury not otherwise appropriated the sum of $3,000, or as much thereof as may be needed for the purpose of carrying out the provisions of this act.' That, save as aforesaid, no other appropriation or provision for the funds with which to carry on the business of said commission and pay the salaries of the commissioners and the expenses of their offices was or has been made. That there has been credited to the account of said tax commission, in the office of this defendant as such state auditor, the full amount of said appropriation of $3,000 for the year 1913; and that up to the 1st day of May, 1913, there had been drawn warrants of the state by this defendant against the amount of such appropriation for the salaries,

of the members of said commission and their expenses the entire amount of such appropriation, except about the sum of $101, and that on said 1st day of May there remained in the fund so provided insufficient moneys with which to pay the salary of any member of said tax commission. This defendant specifically denies that there has been made any provision whereby the salaries of said commissioners are to be paid out of the general appropriation for salaries of state officers; and further denies that there has been any appropriation providing for the payment of the expenses of said commission for the items of stenography, postage, express, and necessary supplies furnished to said tax commission out of the general appropriation for capital maintenance; and further denies that there has been any appropriation providing for the payment of the expenses of said commission for printing out of the general appropriation for public printing for the various state offices and departments. And in that behalf this defendant respectfully refers this honorable court, and asks the court to take judicial notice of the records of the twelfth legislative assembly of the state of North Dakota relative to the act by which the said tax commission was established and provision made for its maintenance. And herein the court is respectfully referred to page 320 of the house journal under date of February 1, 1911; page 406 of the house journal under date of February 3, 1911; page 408 of the house journal under date of February 8, 1911; page 1669 of the house journal under date of March 2, 1911; page 1894 of the house journal under date of March 3, 1911; page 2153 of the house journal under date of March 3, 1911; page 2157 of the house journal under date of March 3, 1911; and the court is further referred in the same behalf to page 446 of the senate journal for the twelfth legislative assembly under date of January 9, 1911; page 465 of the senate journal under date of February 9, 1911; page 737 of the senate journal under date of February 18, 1911; page 1335 of the senate journal under date of March 2, 1911; page 1392 of the senate journal under date of March 2, 1911; page 1394 of the senate journal under date of March 2, 1911; page 1569 of the senate journal under date of March 3, 1911; page 1584 of the senate journal under date of March 3, 1911; page 1768 of the senate journal under date of March 3, 1911; page 1781 of the senate journal under date of March 3, 1911. The

defendant further alleges that it has been the rule and custom of the office of the state auditor to pay out of the general appropriation for the salaries of state officers and for capitol maintenance and public printing only those salaries and expenses earned and incurred by the regularly elected officers of the state; and that the salaries and expenses of all members of appointive boards, commissions, and bureaus have been paid and charged only to the fund provided by the appropriation for each such board, commission, committee, or bureau. This defendant further alleges that the terms of office of each of the plaintiffs as members of said tax commission expired on the 19th day of January, 1913, under and by the terms of said chapter 303 of the Session Laws of this state for 1911, by reason of the fact that the state senate was regularly in session from the 1st Monday in January, 1913, to and including Saturday, the 18th day of January, 1913, but that during said period and at no time during such session of the senate were the appointments of said plaintiffs as members of such tax commission, or of either of them, confirmed or approved by the senate of this state, as more fully appears by the published proceedings of the senate contained in its journals during said period, to which said journal reference is hereby made for the purpose of this return, and of which proceedings this honorable court is asked to take judicial notice. That by reason of the matters and things hereinbefore set forth this defendant has not issued his auditor's warrants to either of said plaintiffs, as directed by said writ, for the salaries of said officers for the month of April 1913, nor has the defendant credited the account of said tax commission for the year 1913 with the amount of $6,000, subject to expenditure by the tax commission for salaries of secretary, clerks, stenographers, and experts; and that defendant has not credited the account of said tax commission with $4,500, subject to expenditure by the tax commission for office supplies and traveling expenses for the year 1913, or with any other sum or amount save and except as hereinbefore set forth. And the defendant respectfully shows to this court that he is advised and believes that to so issue warrants and so credit said commission with said sum would be a violation of his duties as auditor of the state of North Dakota under the laws of such state. Wherefore, the defendant prays that said writ may be dismissed."

*Luther E. Birdzell* and *George E. Wallace,* for petitioners.

The questions here at issue involve the prerogatives, rights, and franchises of state government, and the supreme court of this state has original jurisdiction. Const. §§ 86, 87; Rev. Codes 1905, §§ 6751–7822; State ex rel. Goodwin v. Nelson County, 1 N. D. 101, 8 L.R.A. 283, 26 Am. St. Rep. 609, 45 N. W. 33; State ex rel. Moore v. Archibald, 5 N. D. 359, 66 N. W. 234; State ex rel. Wineman v. Dahl, 6 N. D. 81, 34 L.R.A. 97, 68 N. W. 418; State ex rel. Plain v. Falley, 8 N. D. 90, 76 N. W. 996; State ex rel. Wolfe v. Falley, 9 N. D. 450, 83 N. W. 860; State ex rel. Fosser v. Lavik, 9 N. D. 461, 83 N. W. 914; Anderson v. Gordon, 9 N. D. 480, 52 L.R.A. 134, 83 N. W. 993; State ex rel. Granwold v. Porter, 11 N. D. 309, 91 N. W. 944; State ex rel. Buttz v. Liudahl, 11 N. D. 320, 91 N. W. 950; State ex rel. Byrne v. Wilcox, 11 N. D. 329, 91 N. W. 955; State ex rel. Walker v. McLean County, 11 N. D. 356, 92 N. W. 388; Duluth Elevator Co. v. White, 11 N. D. 534, 90 N. W. 14; State ex rel. Mitchell v. Larson, 13 N. D. 420, 101 N. W. 315; State ex rel. Rusk v. Budge, 14 N. D. 532, 105 N. W. 724; State ex rel. Frich v. Stark County, 14 N. D. 368, 103 N. W. 913; State ex rel. Madderson v. Nohle, 16 N. D. 168, 125 Am. St. Rep. 628, 112 N. W. 141; State ex rel. Erickson v. Burr, 16 N. D. 581, 113 N. W. 705; State ex rel. Steel v. Fabrick, 17 N. D. 532, 117 N. W. 860; State ex rel. Cooper v. Blaisdell, 17 N. D. 575, 118 N. W. 225; State ex rel. McCue v. Blaisdell, 18 N. D. 55, 24 L.R.A. (N.S.) 465, 138 Am. St. Rep. 741, 118 N. W. 141; 18 N. D. 31, 119 N. W. 360; State ex rel. Miller v. Norton, 20 N. D. 180, 127 N. W. 717; State ex rel. Williams v. Meyer, 20 N. D. 628, 127 N. W. 834; State ex rel. Miller v. Miller, 21 N. D. 324, 131 N. W. 282; State ex rel. Watkins v. Norton, 21 N. D. 473, 131 N. W. 257; State ex rel. Miller v. Taylor, 22 N. D. 362, 133 N. W. 1046.

The petitioners are state officers, and their duties are therefore of a public nature. 36 Cyc. 852; Mechem, Pub. Off. chap. 1; Throop, Pub. Off. §§ 3, 4. That the petitioners are state officers see: Mechem, Pub. Off. § 35; Throop, Pub. Off. § 10; 36 Cyc. 852; State ex rel. Clyatt v. Hocker, 39 Fla. 477, 22 So. 721, 63 Am. St. Rep. 174, and note following; Re Advisory Opinion to Governor, 49 Fla. 269, 39 So. 63; People ex rel. Foley v. Montez, 48 Colo. 436, 110 Pac. 639; Blue v. Tet-

rick, 69 W. Va. 742, 72 S. E. 1033; Blue v. Smith, 69 W. Va. 761, 72 S. E. 1038.

That specific appropriations are made by law for the purpose of maintaining the tax commission. State ex rel. McDonald v. Holmes, 19 N. D. 286, 123 N. W. 884; Thomas v. Owens, 4 Md. 226; Garr v. State, 127 Ind. 204, 11 L.R.A. 370, 22 Am. St. Rep. 625, 26 N. E. 778; Campbell v. State Soldiers' & S. Monument Comrs. 115 Ind. 591, 18 N. E. 33; Henderson v. State Soldiers' & S. Monument Comrs. 13 L.R.A. 169, and note, 129 Ind. 92, 28 N. E. 127; Ristine v. State, 20 Ind. 338; Reynolds v. Taylor, 43 Ala. 420; People ex rel. Hegwer v. Goodykoontz, 22 Colo. 507, 45 Pac. 414; Proll v. Dunn, 80 Cal. 220, 22 Pac. 143; Humbert v. Dunn, 84 Cal. 57, 24 Pac. 111 (cited with approval) in the late California case of Harrison v. Horton, 5 Cal. App. 415, 90 Pac. 716; State ex rel. Buck v. Hickman, 10 Mont. 497, 26 Pac. 386; State ex rel. Noonan v. King, 108 Tenn. 271, 67 S. W. 812; Kendall v. Raybauld, 13 Utah, 226, 44 Pac. 1034; note to State ex rel. Davis v. Eggers, 16 L.R.A.(N.S.) 630; State ex rel. Brainerd v. Grimes, 7 Wash. 191, 34 Pac. 833; State ex rel. Henderson v. Burdick, 4 Wyo. 272, 24 L.R.A. 266, 33 Pac. 125; State ex rel. Holcombe v. Burdick, 4 Wyo. 290, 33 Pac. 131; 2 Lewis's Sutherland Stat. Constr. §§ 368–370, 594.

"No money shall be paid out of the state treasury, except upon appropriation by law." Const. § 186; Thomas v. Owens, 4 Md. 189; Ristine v. State, 20 Ind. 328; Carr v. State, 127 Ind. 204, 11 L.R.A. 370, 22 Am. St. Rep. 625, 26 N. E. 778; Harrison v. Horton, 5 Cal. App. 415, 90 Pac. 716; State ex rel. Noonan v. King, 108 Tenn. 271, 67 S. W. 812; State ex rel. Brainerd v. Grimes, 7 Wash. 191, 34 Pac. 833.

Where the nature and amount of services rendered the state are definitely fixed, and the compensation therefor limited by law, the duty of auditing and allowing claims for such services becomes a mere ministerial act. Shattuck v. Kincaid, 31 Or. 379, 49 Pac. 758; State ex rel. Henderson v. Burdick, 4 Wyo. 272, 24 L.R.A. 266, 33 Pac. 125.

Section 7 of chapter 303 of the Session Laws of 1911 contains every element essential to make it an appropriation. The same is true of the other sections of our laws, to which attention has been called. Henderson v. State Soldiers' & S. Monument Comrs. 129 Ind. 92, 13 L.R.A.

169, 28 N. E. 127; State ex rel. Henderson v. Burdick, 4 Wyo. 272, 24 L.R.A. 266, 33 Pac. 125.

*Barnett & Richardson* and *Palda, Aaker, & Greene,* for defendant.

The important point in the determination and construction of *acts* and *laws* is to ascertain the legislative intent.

The language of the *title* of a bill or act is not controlling upon the question of construction, but it is important as throwing light upon the question of *intent.*    Reference may also be had to the preamble as an aid in construing a statute.    Hahn v. Salmon, 10 Sawy. 183, 20 Fed. 801; Nazro v. Merchants' Mut. Ins. Co. 14 Wis. 295; People ex rel. McCullough v. Pacheco, 27 Cal. 175; Holbrook v. Holbrook, 18 Pick. 248; Church of the Holy Trinity v. United States, 143 U. S. 457, 36 L. ed. 226, 12 Sup. Ct. Rep. 511; Hines v. Missouri P. R. Co. 86 Mo. 629; Coosaw Min. Co. v. South Carolina, 144 U. S. 550, 36 L. ed. 537, 12 Sup. Ct. Rep. 689; Cohen v. Barrett, 5 Cal. 195; People ex rel. Flynn v. Abbott, 16 Cal. 358.

By the act under consideration, the legislature intended to make but one single appropriation for the purposes mentioned, and this to the exclusion of any and all others.    Laws 1911, chapter 303; S. D. Sess. Laws (1913) 221.

The intention of the legislature of 1911 was that the expenditures to be made under chapter 303 were limited to $3,000,—the appropriation carried by § 14.    That the legislature of 1913 increased such appropriation, by eliminating § 14.    The act of the 1913 legislature having been vetoed, the 1911 law remained in force, and no greater appropriation than $3,000 existed.    Texas & P. R. Co. v. Interstate Commerce Commission, 162 U. S. 197, 40 L. ed. 940, 5 Inters. Com. Rep. 405, 16 Sup. Ct. Rep. 666; Ex parte Farley, 40 Fed. 66; Edger v. Randolph County, 70 Ind. 331; Stout v. Grant County, 107 Ind. 343, 8 N. E. 222; Harrington v. Smith, 28 Wis. 43; Hill v. Mitchell, 5 Ark. 608.

It was clearly the intention of the legislature of 1911, that the future life of the tax commission, and the provision for its maintenance, should be left to the legislature of 1913.    Atty. Gen. v. Bank of Cape Fear, 40 N. C. (5 Ired. Eq.) 71; Westbrook v. Miller, 56 Mich. 148, 22 N. W. 256; Scanlan v. Childs, 33 Wis. 663; Re Street Opening, 12 Misc.

526, 33 N. Y. Supp. 594; Leddy v. Cornell, 52 Colo. 189, 38 L.R.A. (N.S.) 918, 120 Pac. 153, Ann. Cas. 1913C, 1304.

The use of the words "until" and "when," as found in the act, limits the right of confirmation of these appointments, to a time *before* the third Monday in January, 1913. If not so confirmed, the offices were *vacant* on that day.

Words should be given their ordinary meaning. State ex rel. Cosgrove v. Perkins, 139 Mo. 106, 40 S. W. 650; Maginn v. Lancaster, 100 Mo. App. 116, 73 S. W. 368; Croco·v. Hille, 66 Kan. 512, 72 Pac. 208; People ex rel. Cornell S. B. Co. v. Hornbeck, 30 Misc. 212, 61 N. Y. Supp. 978; Ryan v. State Bank, 10 Neb. 524, 7 N. W. 276; Webster v. French, 12 Ill. 302; People v. Walker, 17 N. Y. 502; Willey v. Laraway, 64 Vt. 566, 25 Atl. 435; Bemis v. Leonard, 118 Mass. 502, 19 Am. St. Rep. 470; Hartman v. Ringgenberg, 119 Ind. 72, 21 N. E. 464; Clarke v. New York, 111 N. Y. 621, 19 N. E. 436.

BRUCE, J. (after stating the facts as above). The case before us is clearly one which involves "the prerogatives, rights, and franchises of the state government," and is therefore one in which it is not only the right, but the duty, of this court to exercise original jurisdiction. Constitution of North Dakota, §§ 86, 87; Rev. Codes 1905, §§ 6751, 7822; State ex rel. Goodwin v. Nelson County, 1 N. D. 88 at 101, 8 L.R.A. 283, 26 Am. St. Rep. 609, 45 N. W. 33; State ex rel. Moore v. Archibald, 5 N. D. 359, 66 N. W. 234; State ex rel. Wineman v. Dahl, 6 N. D. 81, 34 L.R.A. 97, 68 N. W. 418; State ex rel. Plain v. Falley, 8 N. D. 90, 76 N. W. 996; State ex rel. Wolfe v. Falley, 9 N. D. 450, 83 N. W. 860; State ex rel. Fosser v. Lavik, 9 N. D. 461, 83 N. W. 914; State ex rel. Granvold v. Porter, 11 N. D. 309, 91 N. W. 944; Anderson v. Gordon, 9 N. D. 480, 52 L.R.A. 134, 83 N. W. 993; State ex rel. Buttz v. Liudahl, 11 N. D. 320, 91 N. W. 950; State ex rel. Byrne v. Wilcox, 11 N. D. 329, 91 N. W. 955; State ex rel. Walker v. McLean County, 11 N. D. 356, 92 N. W. 388; Duluth Elevator Co. v. White, 11 N. D. 534, 90 N. W. 14; State ex rel. Mitchell v. Larson, 13 N. D. 420, 101 N. W. 315; State ex rel. Rusk v. Budge, 14 N. D. 532, 105 N. W. 724; State ex rel. McDonald v. Holmes, 16 N. D. 457, 114 N. W. 367; State ex rel. Frich v. Stark County, 14 N. D. 368, 103 N. W. 913; State ex rel. Madderson v. Nohle, 16 N. D.

168, 125 Am. St. Rep. 628, 112 N. W. 141; State ex rel. Erickson v. Burr, 16 N. D. 581, 113 N. W. 705; State ex rel. Steel v. Fabrick, 17 N. D. 532, 117 N. W. 860; State ex rel. Cooper v. Blaisdell, 17 N. D. 575, 118 N. W. 225; State ex rel. McCue v. Blaisdell, 18 N. D. 55, 24 L.R.A. (N.S.) 465, 138 Am. St. Rep. 741, 118 N. W. 141; State ex rel. McCue v. Blaisdell, 18 N. D. 31, 119 N. W. 360; State ex rel. Miller v. Norton, 20 N. D. 180, 127 N. W. 717; State ex rel. Williams v. Meyer, 20 N. D. 628, 127 N. W. 834; State ex rel. Miller v. Miller, 21 N. D. 324, 131 N. W. 282; State ex rel. Watkins v. Norton, 21 N. D. 473, 131 N. W. 257; State ex rel. Miller v. Taylor, 22 N. D. 362, 133 N. W. 1046; State ex rel. Shaw v. Thompson, 21 N. D. 426, 131 N. W. 231; Atty. Gen. v. Chicago & N. W. R. Co. 35 Wis. 426.

It is a case which is honestly and properly brought by all of the parties to the litigation. It is urged by the tax commissioners, because the law intrusts them with the performance of public duties of great importance which require adequate appropriations for their performance. It is contested by the state auditor, because, as a public official, it is his sworn duty to rigidly and fearlessly perform the duties of his office, and to only audit those accounts for which, in his opinion, valid appropriations have been made. It is his duty to exercise his sound discretion and his best judgment, and to refuse to audit accounts whenever he entertains any reasonable doubt of their validity. It is in the courts alone, that matters such as these can be finally and definitely settled. Ours is a government by law, and by law alone.

The first contention of the petitioners is that § 5 of chapter 303 of the Laws of 1911, and which provides that "each commissioner, within thirty days after notice of his appointment, and before entering upon the discharge of the duties of his office, shall take, subscribe, and file with the secretary of state, the oath of office prescribed by law. Each of said commissioners *shall receive* an annual salary of $3,000, payable in the same manner that salaries of other state officers are paid," makes a continuing appropriation of $9,000 annually for the payment of such salaries, and that it is the duty of the state auditor to draw warrants accordingly without further legislative expression upon the subject.

We think they are correct in this contention. Section 391 of the Code of 1905 provides that "there is annually appropriated out of any funds in the state treasury not otherwise appropriated, such sums as

may be necessary to pay the salaries of the various state officers." The tax commissioners are intrusted by chapter 303 of the Laws of 1911 with important administrative and supervisory functions. They have the power, and it is their duty to exercise supervision over the assessments, and tax laws of the state, over assessors, boards of review, and boards of equalization; to confer with, and advise, and direct assessors and boards; to direct the proceedings, actions, and prosecutions to be instituted to enforce the laws relating to the penalties, liabilities, and punishment of public officers, persons, and officers or agents of corporations for failure or neglect to comply with the provisions of the statute governing the return, assessment, and taxation of property, and to cause complaints to be made against assessors, members of boards of review and of county boards of equalization, in the case of official misconconduct; to require various public officers to report information as to the assessment of property, the collection of taxes, the receipts from licenses, and the expenditures of public funds; to inquire into the system of accounting of public funds in townships, villages, and counties, and to make needed recommendations; to require individuals, partnerships, companies, associations, and corporations to furnish information which may be needful to enable the commission to ascertain the value and relative burdens borne by all kinds of property in the state; to carefully examine into all cases where evasion or violation of the laws for assessment and taxation of property is alleged or discovered; to investigate the tax systems of other states and other countries, and to formulate and recommend such legislation as may be expedient; to consult and confer with the governor of the state upon the subject of taxation, the administration of the laws in relation thereto, and to furnish him from time to time with such assistance and information as he may desire; to assess at their actual value all light, heat, and power companies doing business in this state; to consult and confer with the state board of equalization, and to aid it in the discharge of its duties; to review the assessments made by the different assessors and as equalized by the county boards of equalization, and to order a reassessment of property where the assessment made seems grossly unjust; to require local assessors to place upon the assessment rolls property which may have escaped taxation during the previous six years. They, in short, have administrative and advisory powers which in importance are equal to

those of any other boards or officers of the state. In the case of Parks v. Soldiers' & Sailors' Home Comrs. 22 Colo. 86, 43 Pac. 542, it was held that "every officer of this state who holds his position by election, or appointment, . . . and whose duties are defined by statute, and are in their nature continuous and relate to the administration of the affairs of the state government, and whose salary is paid out of the public funds, is a public officer of either the legislative, executive, or judicial department of the government," and that his salary is therefore a preferred claim against the state. See also People ex rel. Hegwer v. Goodykoontz, 22 Colo. 507, 45 Pac. 414. In 36 Cyc. 852, we find the following: "State officers are those whose duties concern the state at large or the general public, although exercised within defined limits, and to whom are delegated the exercise of a portion of the sovereign power of the state. They are in a . . . sense those whose duties and powers are co-extensive with the state, or not limited to any political subdivisions of the state, and are thus distinguished from municipal officers strictly, whose functions relate exclusively to the particular municipality, and from county, city, town, and school-district officers. . . . The enumeration by the [state] Constitution of certain officers as constituting the executive department of the state does not necessarily deprive the legislature of the power to create other executive offices, although it cannot abolish any of those created by the Constitution." The authorities, in fact, are overwhelming in support of this holding, and we are quite clear that the tax commissioners of North Dakota are state officers. See Mechem, Pub. Off. chap. 1, also § 35, chap. 2; Throop, Pub. Off. § 34, 10; 36 Cyc. 852; State ex rel. Clyatt v. Hocker, 39 Fla. 477, 22 So. 721, 63 Am. St. Rep. 174, and note; Re Advisory Opinion to Governor, 49 Fla. 269, 39 So. 63; People ex rel. Foley v. Montez, 48 Colo. 436, 110 Pac. 639; Blue v. Tetrick, 69 W. Va. 742, 72 S. E. 1033; Blue v. Smith, 69 W. Va. 761, 72 S. E. 1038.

That the provisions of § 5 of chapter 303 of the Laws of 1911, which fix the joint salary of the commissioners at $9,000 per annum, and provides that it shall be payable "in the same manner that salaries of other state officers are paid," taken in conjunction with § 391 of the Code of 1905, which appropriates annually out of "the funds in the state treasury not otherwise appropriated, such sums as may be necessary to pay the salaries of the various state officers," constitutes a valid

appropriation for their said salaries, is also quite clear. In the case of State ex rel. McDonald v. Holmes, 19 N. D. 286, 291, 123 N. W. 884, we said: "From a careful consideration of the authorities on the subject, and of the terms of our Constitution, we think an appropriation in the sense that that word is used in our Constitution is the setting apart from the public revenue of a definite sum of money for the specified object, in such a manner that the officials of the government are authorized to use the amount so set apart, and no more, for that object." Who would contend that there is any indefiniteness in the paragraph of the act of 1911, which provides that "each of said commissioners shall receive an annual salary of $3,000, payable in the same manner that salaries of other state officers are paid?" According to the great weight of authority, this section in itself makes an appropriation, and we so hold. An "appropriation, as applicable to the general fund in the treasury," says the supreme court of Indiana in the case of Ristine v. State, 20 Ind. 328, "may, perhaps, be defined to be an authority from the legislature given at the proper time, and in legal form, to the proper officers to apply sums of money out of that which may be in the treasury, in a given year, to specified objects or demands against the state." In the case of Thomas v. Owens, 4 Md. 189, it was held that a constitutional provision creating officers and fixing salaries amounted to an appropriation for those salaries. The court, in passing upon the case, held that the people had given their consent to the payment of the salary in question, and laid special emphasis upon the words, "shall receive." It is true that in that case the salaries were salaries fixed by the Constitution, but no distinction can be made upon this ground. It is perfectly true, as held in the case of Ristine v. State, 20 Ind. 337, that a promise by the government to pay money is not an appropriation, nor does a duty on the part of the legislature to make an appropriation constitute such; nor does the promise to make an appropriation, nor the pledge of the faith of the state, nor the usage of paying money in the absence of an appropriation. There must in every case be an appropriation; that is, a direction. That is, to use the language of the Holmes Case, "the setting apart from the public revenue of a definite sum of money for the specified object in such a manner that the officials of the government are authorized to use the amount so set apart, and no more, for that object." But there is such a setting apart in the case

at bar. We have thoroughly examined and are fully conversant with the history of the law upon this subject, with the origin of the rule requiring appropriations, and with the jealousy with which the right of the legislature to control the same has been guarded; but we have yet to learn that either the English Parliament or the American legislature has ever been jealous of itself. The reason for requiring legislative appropriations is to be found in the extravagance and prodigality and favoritism of the English Kings, who, for purposes of their own, would squander the revenues, and in the desire of the Parliament to control those Kings, not merely in their expenditures, but in their intrinsic powers, by themselves controlling the purse strings of the state. In this case, however, the legislature has expressed its wish and its desire. It has specified a definite amount to be paid, and directed its payment by the proper officials and in a regular manner. It has had control of the purse strings, and it has itself loosened them. We are quite satisfied, indeed, that even in the absence of § 391 of the Code of 1905, the legislature made a valid appropriation as far as the salaries of the tax commissioners were concerned. Not only is the appropriation in our minds clearly made, but the rule applies in this case which is laid down by the supreme court of Indiana in the case of Carr v. State, 127 Ind. 209, 11 L.R.A. 370, 22 Am. St. Rep. 625, 26 N. E. 780, where the court said: "It is sufficient if the intention to make the appropriation is clearly evinced by the language employed in the statutes upon the subject, or if it is evident that no effect can possibly be given to [such] a statute unless it be construed as making the necessary appropriation." So, too, we have in North Dakota a statutory provision which is all controlling and full of suggestion. Section 101, paragraph 17, provides that "it is the duty of the state auditor to draw warrants on the state treasurer for the payment of money directed by law to be paid out of the treasury," and where such provisions are to be found the courts have, in many instances, held provisions which merely fix salaries as constituting appropriations. See Reynolds v. Taylor, 43 Ala. 420. They have, of course, been much more ready to do so in cases such as that before us, where the salary has been directed to be paid as the salaries of all other state officers, and especially where there is a general appropriation upon the statute books for the payment of the salaries of such officers. "In the case at bar, however," says the su-

preme court of Colorado in the case of People ex rel. Hegwer v. Goody-koontz, 22 Colo. 507, 45 Pac. 414, "there is no intention to make the salary of the inspector [the] subject to further legislation to be inferred from anything expressed in the act. It reads: 'Said inspector shall receive an annual salary of two thousand five hundred ($2,500) dollars and mileage at 10 cents per mile, payable the same as other officers of the state;' and by other acts then and now in force, other state officers are paid in monthly instalments at the end of each and every month, the auditor being required upon request to draw warrants upon the state treasurer for such salaries. Nothing is left indefinite and uncertain under these provisions. . . . The object of the constitutional provision inhibiting the payment of money from the state treasury, except by an appropriation made by law, etc., is to prohibit expenditures of the public funds at the mere will and caprice of the Crown or those having the funds in custody, without direct legislative sanction therefor; but no such evil need be feared, where, as in this case, the salary of the officer is fixed, together with the time and method of his payment. And we conclude that the act creating the office of state boiler inspector, and fixing his salary, when considered in connection with other statutes designating the time, mode, and manner of payment, constitutes a continuous appropriation for such salary, and that no further legislative sanction is necessary to authorize the proper officers to pay the same." See also Harrison v. Horton, 5 Cal. App. 415, 90 Pac. 716, 718. In the case of State ex rel. Noonan v. King, 108 Tenn. 271, 67 S. W. 812, the following was held to be an appropriation: "The salary of said inspector shall be $1,200 per annum, payable monthly on warrant of the comptroller, as other salaries are paid." In the case of State ex rel. Davis v. Eggers, 29 Nev. 469, 16 L.R.A.(N.S.) 630, 91 Pac. 819, the following was held to be an appropriation: "The chairman of such commission shall receive as compensation for his services, to be paid out of the treasury of the state of Nevada, the sum of $2,500 per annum, payable in equal monthly instalments upon the first day of each and every month." See also State ex rel. Brainerd v. Grimes, 7 Wash. 191, 34 Pac. 833; Shattuck v. Kincaid, 31 Or. 379, 49 Pac. 758; State ex rel. Henderson v. Burdick, 4 Wyo. 272, 24 L.R.A. 266, 33 Pac. 125.

We are thoroughly satisfied that § 391 of the Revised Codes of 1905, which provides that "there is hereby annually appropriated out of any

funds in the state treasury not otherwise appropriated, such sums as may be necessary to pay the salaries of the various state officers," is still in force, and that it has not been repealed by chapter 41 of the Session Laws of 1913. The act of 1913 is entitled: "An Act to Appropriate Money for the Expenses of the State Government and for Other Purposes; to repeal § 1737 of the Rev. Codes of 1905, as amended by chapter 1 of the Session Laws of 1911; chapter 73 of the Session Laws of 1909; and chapter 195 of the Session Laws of 1909; chapter 284 of the Session Laws of 1911, and §§ 1295 and 1298 of the Rev. Codes of 1905; § 1296 of the Rev. Codes of 1905, as amended by chapter 31 of the Session Laws of 1909, so far as the same relates to appropriations; chapter 186 of the Session Laws of 1907; §§ 1287, 1288, and 1289 of the Rev. Codes of 1905, as amended in chapter 148 of the Session Laws of 1909; chapter 175 of the Session Laws of 1911; and to repeal all acts in so far as they conflict with the provisions of this act; specifying the amount and time for which such appropriations shall be available, and providing the manner in which the appropriations herein made shall be paid." In the body of the act, appropriations are made for the elected state officers and for the various appointed officers, perhaps all with the exception of the tax commissioners. But that the act was not intended to be exclusive or to repeal § 391 of the Rev. Codes of 1905 before referred to, seems quite apparent from two considerations. The first of these is that the section is not specifically repealed. The second is that the emergency clause of the act seems to intimate that a general appropriation is merely attempted, and not necessarily thought to have been or intended to be accomplished. If the legislature of 1913 had intended to repeal § 391, it seems quite apparent that they would have done so specifically. They specifically repealed a number of other sections of the statute. Section 391 would, it seems, have been the first statute that they would have considered, as it pertained to a general appropriation, and they themselves were legislating in regard to a general appropriation. The fact that they did not repeal it specifically is full of significance. In the case of State ex rel. Henderson v. Burdick, 4 Wyo. 272, 24 L.R.A. 266, 33 Pac. 125, we have an almost identical case. In that case the statute was as follows: "The state examiner shall receive an annual salary of $2,000, and a contingent fund of not to exceed $1,400 for the incidental expenses of his office, which

same shall be paid by the treasurer of the state in the same manner as other salaries and expenses of state officers are paid." It appears from an examination of the opinion, that at one time a provision had been made for the payment of the state examiner in the general appropriation bill, but that the last legislature had omitted the public examiner from such bill. The court nevertheless granted a pre-emptory writ of mandamus, directing the auditor to issue warrants in payment of relator's claim. We are also of the opinion that whether § 391 is repealed or not, § 5 of chapter 303 of the Laws of 1911 of and in itself makes a valid appropriation for the salaries of such officers. We have followed, in short, the language of this court in the case of State ex rel. McDonald v. Holmes, 19 N. D. 286, 291, 123 N. W. 884, when it said: "From a careful consideration of the authorities on the subject and of the terms of our Constitution, we think an appropriation, in the sense that that word is used in our Constitution, is the setting apart from the public revenue of a definite sum of money for the specified object, in such a manner that the officials of the government are authorized to use the amount so set apart, and no more, for that object. . . . Generally, the fixing of a salary of a state official is held to be an appropriation." Humbert v. Dunn, 84 Cal. 57, 24 Pac. 111; Reynolds v. Taylor, 43 Ala. 420; State v. Bordelon, 6 La. Ann. 68; Nichols v. The Comptroller, 4 Stew. & P. (Ala.) 154; State ex rel. Wade v. Kenney, 10 Mont. 485, 26 Pac. 197; State ex rel. McDonald v. Holmes, 19 N. D. 286, 123 N. W. 884; Contra, State ex rel. Brown v. Weston, 6 Neb. 16; Baggett v. Dunn, 69 Cal. 75, 10 Pac. 125.

Following the same line of reasoning and of authority, we are also satisfied that chapter 303 of the Laws of 1911 not only in itself makes a definite and distinct annual appropriation of $9,000 for the salaries of the commissioners, but definite and distinct annual appropriations of $2,400 for the salary of their secretary, $6,000 for clerks, stenographers, and experts, $4,500 for office supplies and traveling expenses, and $3,000 for miscellaneous expenses, such as witness fees, officers' fees in serving summonses and subpœnas, and the cost of depositions. We find, indeed, such an overwhelming weight of authority, of reason, and of sound public policy in favor of petitioners' position, that we can entertain no doubt in relation thereto. It is, of course, well established

that a mere promise to pay does not in itself make an appropriation. Ristine v. State, 20 Ind. 328; State ex rel. Board of Comrs. v. Ristine, 20 Ind. 345; Newell v. People, 7 N. Y. 9; Sunbury & E. R. Co. v. Cooper, 33 Pa. 278.     There is a wide distinction, however, between a promise on the part of a state to pay a third party, and the fixing of definite amounts as salaries and other expenses to be paid, and a direction to its disbursing and auditing officer to pay them *so that the machinery of government may continue to be operated.*     "It does not . . . follow that because no claim can be enforced where there is no appropriation, the appropriation must be made in a particular form or in express terms.     It is sufficient if the intention to make the appropriation is clearly evinced by the language employed in the statutes upon the subject, *or if it is evident that no effect* can possibly be given to a statute unless it be construed as making the necessary appropriation." Carr v. State, 127 Ind. 204, 11 L.R.A. 370, 22 Am. St. Rep. 624, 628, 26 N. E. 778.     "A direction to the officers to pay money out of the treasury upon a given claim, or for a given object, may, by implication, include in the direction an appropriation."     Ristine v. State, and Carr v. State, supra.     "If the salary of a public officer is fixed, and the time of payment prescribed by law, no special annual appropriation is necessary to authorize the auditor to issue his warrant for its payment." Reynolds v. Taylor, 43 Ala. 420; Nichols v. The Comptroller, 4 Stew. & P. (Ala.) 154; Thomas v. Owens, 4 Md. 189; Green v. Purnell, 12 Md. 329; State ex rel. Buck v. Hickman, 10 Mont. 497, 26 Pac. 386; State ex rel. Roberts v. Weston, 4 Neb. 216; Carr v. State, 127 Ind. 204, 11 L.R.A. 370, 22 Am. St. Rep. 624, 629, 26 N. E. 778.     "Under our system of government," says the supreme court of Maryland in the case of Thomas v. Owens, 4 Md. 189, 225, "its powers are wisely distributed to different departments; each and all are subordinate to the Constitution, which creates and defines their limits; whatever it commands is the supreme and uncontrollable law of the land.     This is not denied *directly,* although it is inferentially, substantially, and *practically.*     It is said that inasmuch as the 20th section of the 3d article of the Constitution declares, 'No money shall be drawn from the treasury of the state, except in accordance with an appropriation made *by law'* that an *act of Assembly* must precede the withdrawal, and inasmuch as none such has been passed covering the period antecedent to the 1st

of January, 1852, there is, therefore, no appropriation, *by law* for that time. To this reasoning we cannot yield our consent. In the construction of any instrument the whole paper ought to be considered, *that the will of its framers may be truly and accurately ascertained;* the objects contemplated and the purposes to be subserved should be constantly kept in view, *and the language used interpreted in reference to the manifest intent.* Now what could have been the purpose of the clause in the Constitution to which we have referred? It was obviously inserted to prevent the expenditure of the people's treasure *without their consent,* either as expressed by themselves in the organic law, or by their representatives in constitutional acts of legislation. To use the language of Justice Story (Vol. 3, Contr. § 1342), its purpose 'is to secure *regularity, punctuality,* and *fidelity* in the disbursements of the public money;' and, as said by Judge Tucker in his commentaries (1 Tucker's Bl. Com. Appx. 362): 'All the expenses of government being paid by the people, it is the right of the *people,* not only not to be taxed without their *own consent,* or that of their representatives freely chosen, but also to be actually *consulted* upon the disposal of the money.' Such a provision, says the same learned writer, 'forms a salutary check, not only upon the extravagance and profusion in which the executive department might indulge itself, and its adherents and dependents; but also against any misappropriation which a rapacious, ambitious, or otherwise unfaithful executive might be disposed to make. In those governments where the people are taxed by the executive, no such check can be interposed. The prince levies whatever sums he thinks proper; disposes of them as he thinks proper; and would deem it sedition against him and his government if any account were required of him, in what manner he had disposed of any part of them. Such is the difference between governments where there is responsibility and where there is none.' These being the purposes and objects of the clause, the question is: *Have the people given their consent to the payment of the salary of the Comptroller?* That they have done so is palpably manifest. They have said, he 'shall receive an annual salary of $2,500.' They have not merely said he may *claim* such a sum, but, emphatically, that he 'shall *receive*' it. It is impossible for human language to be less ambiguous or more positive. The people, in their organic law—which is paramount to all other law—have not only given

their *consent,* but they have imperatively issued their commands, that the particular officer *'shall receive'* it. How is their will obeyed, if it be within the power of the treasurer, or anyone else, to withhold it from caprice, unfaithfulness to duty, or from mistaken judgment? To allow of such a power in that officer would be to put him above the Constitution, whose creature he is. It would be to invest him with authority to annul the sovereign will; in fact, to stop the wheels of government and reduce things into the wildest confusion. The Constitution has said the officer *'shall receive'* his salary, and this *fiat* of the supreme will is not to be nullified by the mere *ipse dixit* of a mere *ministerial* officer; for such, and none other, is the treasurer." In this statement is to be found the whole gist of the question, and the arguments therein adduced and the conclusions to be derived therefrom, are, in our minds, unanswerable. It is true that the opinion is an old one, but it has borne the scrutiny of sixty years, has been cited with approval over and over again, and has been but rarely criticized. It is true that in the Maryland case quoted from, the salaries of the officers were fixed by the Constitution, but this makes no difference. Under the American system of government the entire sovereignty of the people is vested in the legislature, and that sovereignty is supreme except as controlled by the state or Federal Constitutions. The state and Federal Constitutions contain no limitations in the matters before us, and we have therefore the sovereign people speaking through the voice of the legislature. It is not for this court or for any other officer to disobey their command. See State ex rel. Henderson v. Burdick, 4 Wyo. 272, 24 L.R.A. 266, 33 Pac. 125, 127.

We, of course, realize that the cases cited are opposed to the ruling in Myers v. English, 9 Cal. 341, and State ex rel. Brown v. Weston, 6 Neb. 16. We are, however, also aware of the fact that these cases have not been generally followed, and are opposed to the weight of authority. See Humbert v. Dunn, 84 Cal. 57, 24 Pac. 111. We also believe that their reasoning is untenable, as it fails entirely to recognize the fact that it was the royal and executive expenditures and extravagances that the constitutional provisions sought to check and to prevent, and not the exercise of the sovereign power of the legislative assembly or of the people whom these legislative assemblies represented. We are aware of the opinion in People ex rel. Richardson v. Spruance,

8 Colo. 530, 9 Pac. 628. The facts of that case, however, are materially different from those in the case at bar, and even if the opinion is in conflict with the ideas which we herein express, that opinion has been modified, if not overruled, by Mullen v. McKim, 22 Colo. 468, 45 Pac. 416. We are also aware of the case of Leddy v. Cornell, 52 Colo. 189, 38 L.R.A.(N.S.) 918, 120 Pac. 153, Ann. Cas. 1913C, 1304, which holds that a provision providing for the appointment of a secretary who shall be paid a salary not to exceed $1,800 a year and his necessary traveling expenses does not constitute a continuous appropriation, as the amount is not definitely fixed. The case, however, is not a well-considered case, and the point under discussion is merely brushed aside. The distinction made is at any rate too technical for us to follow. In the statute before us the limits of the expenditures, both for the salary of the secretary and the expenses of operating the commission, are definitely fixed; and this, we think, is sufficient. It has been the constant practice in this state to appropriate "not to exceed" certain amounts, or certain amounts, "or so much thereof as may be necessary," and for us to follow the Colorado case last cited would be not only to invalidate many useful appropriations, but to prevent all economy in administration. It would tend to maximum appropriations and the reaching of this limit and maximum by those intrusted with the disbursements of the funds and the management of the various state institutions and departments, no matter whether the services or supplies could be had or purchased at a smaller sum or the needs of the institutions or departments actually required the full expenditure or not. So, too, as pointed out in the case of State ex rel. Henderson v. Burdick, supra, the decisions of the California courts on the subject of appropriations have been entirely inconsistent, and lose much of their authority by their absolute irreconcilability. See also note to Carr v. State, 127 Ind. 204, 11 L.R.A. 370, 26 N. E. 778, which is found in 22 Am. St. Rep. 628. In the Burdick Case, indeed, the supreme court of Wyoming, after thoroughly reviewing the decisions of the supreme court of California, as well as those of other states, held that an act which provided that "the state examiner shall receive an annual salary of $2,000, and a contingent fund of not to exceed $1,400, for the incidental expenses of his offices, which same shall be paid by the treasurer of the state in the same manner as other salaries and expenses.

of state officers are paid," operated as an appropriation act, and did not require any other legislation or a special appropriation at each regular session of the legislature to keep it alive. The opinion is a well-considered one, and is well worthy of our consideration.

We are also aware of the case of State ex rel. Norfolk Beet-Sugar Co. v. Moore, 50 Neb. 88, 61 Am. St. Rep. 538, 69 N. W. 373. In that case, however, there was no certainty either as to the expenditure or as to the limits to the fund or attempted appropriation. Where such certainty has existed the Nebraska courts have in several cases held that appropriations have been made. See Re Groff, 21 Neb. 647, 59 Am. Rep. 859, 33 N. W. 426; State ex rel. Lanham v. Babcock, 24 Neb. 787, 40 N. W. 316; State ex rel. Sayre v. Moore, 40 Neb. 854, 25 L.R.A. 774, 59 N. W. 755.

But respondent claims that the appropriation of $3,000 contained in § 14 of chapter 303 of the Laws of 1911 is all-conclusive and was intended to be the sole and only appropriation until some future legislature should see fit to increase it. He argues that the legislature of 1911, from a sense of economy, and on account of the financial condition of the state, wished to confine the appropriations for the tax commission to that amount, and cites in support of his proposition the emergency clause (§ 15), which provides that, "whereas the finances of the state will not warrant the full expenses to be incurred herein, it is hereby provided that this act shall take effect July 1, 1912, and that the appointments shall not be made until July 1, 1912, the same to be thereafter confirmed by the senate in the legislative session of 1913." His argument, however, goes too far. It is quite clear that the legislature did intend to save money. It provided a means to do this, however, in its postponement of the taking effect of the law until July 1, 1912. This is all the saving that we can believe it intended to make. It provided in unequivocable terms for the commission, and outlined its work and its duties, among which was to make a report to the legislature at its biennial sessions. It provided that the act should take effect on July 1, 1912, and six months before the legislative session of 1913 was to commence. The total annual expenditure provided by the act was $24,900. The proportionate cost of running the commission for these six months would be $12,450. It is absurd to concede or believe that the legislature only intended to appropriate $1,500 for this pur-

pose. If, indeed, it intended to save any more than the cost of operating the commission for the eighteen months during which its creation was postponed, why did it not postpone the whole matter, and the making of all appropriations, and the creation of the commission, until the next general session of the legislature? We must assume that it intended that the commissioners should be appointed on July 1, 1912, and be prepared to make a report of their work to the legislature in 1913. We cannot assume that our legislative bodies are playing with government and creating commissions that they do not intend to support, or do not intend to be punctually appointed.

It is also claimed by counsel for respondent that this court can and should scrutinize the history of the passage of the law of 1911, and that a perusal of the records will show and the legislative journals disclose the fact that when the bill was first introduced it provided for an appropriation of $19,500, in place of the $3,000 now contained in § 14. It is argued that the amendment of this section so as to read $3,000 instead of $19,500, clearly shows that the legislature intended that $3,000 was all that should be appropriated. We do not, however, draw such an inference from the facts. It, on the other hand, is quite apparent to us that when the bill was scrutinized by the committee it was discovered that definite appropriations were made in §§ 5, 6, 7, and 8 of the act for the greater part of the expenses incidental to the maintenance of the commission, and that such being the case $19,500 would be too much, and that the section was therefore amended and the amount reduced to $3,000, which sum was provided to cover incidental expenses, such as witness fees, fees of officers in serving summons and subpoenas, and which expenses were not expressly provided for in the other sections of the act. If any presumptions are to be made, they must be made in favor of the act, and not against it. Of all the presumptions the strongest is that our legislators are serious-minded men, and are not trifling with politics or with government. The presumption therefore follows that they did not intend to create a commission and then to strangle it by failing to provide for its maintenance.

Respondent further contends that there is no tax commission at all, and therefore no need of any appropriation or of any action on the part of the state auditor. He states that § 2 of the act provides that "said tax commission shall be composed of three commissioners, who shall be

appointed by the governor by and with the advice and consent of the senate.   Of such three persons, one shall be appointed and designated to serve for a term ending on the first Monday in May, 1915, one for a term ending on the first Monday in May, 1917, and one for a term ending on the first Monday in May, 1919, each of said terms to begin upon the qualification of the person appointed therefor.   Upon the expiration of the terms of the three commissioners first to be appointed as aforesaid, each successive commissioner shall be appointed and hold his office for the term of six years, except in case of a vacancy as herein-after provided, and such commissioner shall hold his office until his successor shall have been appointed and qualified; while § 3 provides that "after the appointment of said first three commissioners, and except when appointed to fill a vacancy, each commissioner shall be appointed on or before the last Monday in January, during the biennial session of the legislature, next preceding the commencement of the term for which he shall be appointed.   In case of vacancy, it shall be filled by appointment by the governor for the unexpired portion of the term in which such vacancy shall occur, subject to confirmation by the senate.   If such appointment be made when the legislature is not in regular session, the appointee shall hold his office until the third Monday in January in the next biennial session of the legislature, when if such appointment is not confirmed by the senate, the office shall become vacant, and, on or before the last Monday in February, the governor, by and with the advice and consent of the senate, shall appoint a suitable person to fill such vacancy for the remainder of such term."   Counsel states, and the record shows, that the present commissioners were appointed on the 1st of July, A. D., 1912, and that they were not confirmed by the senate until the afternoon of January 20th, that being the third Monday in the month.   He argues that the confirmation was too late, and that such confirmation should have been made prior to the Monday in question.

Counsel for respondent, however, is in error in assuming that the word "until" usually excludes the last day.   It is well established by the authorities that the word " 'until' may either, in a contract or a law, have an inclusive or exclusive meaning, according to the subject to which it is applied, the nature of the transaction which it specifies, and the connection in which it is used."   (8 Words & Phrases, 7217, 7218.) And the authorities are numerous that it may be held to include the day

to which it is prefixed. Such, indeed, is the almost universal rule where the word is used with reference to a future day on which something is required to be done. Re Croft, 14 W. N. C. 437; Bunce v. Reed, 16 Barb. 347, 352; Dakins v. Wagner, 3 Dowl. P. C. 535; Hahn v. Dierkes, 37 Mo. 574; Penn Placer Min. Co. v. Schreiner, 14 Mont. 121, 35 Pac. 878; Gottlieb v. Fred W. Wolf Co. 75 Md. 126, 23 Atl. 198; Glynn County Academy v. Dart, 67 Ga. 765; Louisville & N. R. Co. v. Turner, 81 Ky. 489; Newport News & M. Valley R. Co. v. Thomas, 96 Ky. 613, 29 S. W. 437; Conway v. Smith Mercantile Co. 6 Wyo. 327, 49 L.R.A. 201, 44 Pac. 940; St. Louis & S. F. R. Co. v. Gracy, 126 Mo. 472, 28 S. W. 736, 29 S. W. 579, 580; State v. Mosley, 116 Mo. 545, 22 S. W. 804; Houghwout v. Boisaubin, 18 N. J. Eq. 315, 318; Barker v. Keith, 11 Minn. 65, 67, Gil. 37, 40; Clarke v. New York, 111 N. Y. 621, 19 N. E. 436; Rogers v. Cherokee Iron & R. Co. 70 Ga. 717; Consolidated Kansas City Smelting & Ref. Co. v. Peterson, 8 Kan. App. 316, 55 Pac. 673; Kendall v. Kingsley, 120 Mass. 94, 95; Ryan v. State Bank, 10 Neb. 524, 7 N. W. 276. Even the few authorities which, under the state of facts presented, hold that the word "until" is exclusive, and not inclusive, hold that "this word 'until,' whether found in a contract or in a statute, is the same, and in either case [its meaning] must depend upon the intention of those using it, as manifested by the context, and considered with reference to the subject to which it relates." See Ryan v. State Bank, 10 Neb. 524, 7 N. W. 276–278; People ex rel. Cornell S. B. Co. v. Hornbeck, 30 Misc. 212, 61 N. Y. Supp. 978; Croco v. Hille, 66 Kan. 512, 72 Pac. 208; Webster v. French, 12 Ill. 302, 303. It is to be noted that in the section under consideration, the statute provides that "the appointee shall hold his office until the third Monday in January in the next biennial session of the legislature, *when* if such appointment is not confirmed by the senate, the office *shall become vacant,* etc." The use of the word "when," clearly signifies an intention that something shall be done on the first Monday in January, and its use in the statute has an important bearing upon the interpretation of the word "until." The words, "shall become vacant," are also future in their form, and clearly indicate that no vacancy was presumed until after failure to confirm on the Monday in question. It is quite clear to us that the legislative intention was that the appointees should hold their offices until the third Monday in

January, when the matter of their confirmation should be taken up, and that if they were not confirmed on or before that day that then the office should be vacant. Counsel for respondent, we know, says: "No person would long fail to distinguish the difference in meaning of the terms, 'until next Monday,' and 'on or before next Monday.' One man says to another: 'I rent you my house until the 1st day of May;' would anyone say that the tenancy did not expire on the 30th day of April? If he should say, 'I rent you my house until the 1st day of May, when I shall move into it myself,' no one would say that 'when' referred to anything other than the 1st day of May, and the use of the word 'when' only makes it more definite and certain that the tenancy ended on April 30th, and that the landlord would occupy it on the following day." In this argument, however, he concedes the whole question. He admits that the words, "when I shall move into it myself," fixed the time when the landlord might enter. Our legislature prescribes the time when the legislature shall formally pass upon the matter of confirmation, and that is the third Monday in January. The trouble with his illustration is that the tenancy is, by the terms of the agreement, definitely limited and terminated; while under the statute in question there is no termination of the right to the office unless the legislature shall fail to confirm the same. If the legislature intended that the office should become vacant before the third Monday in January, on which day the confirmation or nonconfirmation was provided for, why did they not use the words, "when if such appointment *shall not have been* confirmed," and not use the words that they did, "when, if such appointment is not confirmed." It is perfectly clear from the authorities that the words "when" and "is" and "become," in such a context, have a future, and not a past or present, meaning. See Hammond v. Buchanan, 68 Ga. 728–731; Providence & W. R. Co. v. Yonkers F. Ins. Co. 10 R. I. 74–77; Re Birdsall, 22 Misc. 180, 49 N. Y. Supp. 450, 463; Wilkinson v. Winne, 15 Minn. 159, 166, Gil. 123; Kirtz v. Peck, 113 N. Y. 222, 21 N. E. 130, 131; Quanah v. White, 88 Tex. 14, 28 S. W. 1065–1067; Hening v. Nelson, 20 Ga. 583, 584. See also Webster's Dict.

But there is another and more controlling reason for holding that the commission was and still is in existence, and that is, that there was no necessity for any confirmation by the legislature, either prior to or upon the third Monday of January, but that under the statute the

commission could be confirmed at any time during the legislative session. A reading of §§ 2 and 3 of the act will, we believe, make it clear to anyone that the confirmation to be made on the third Monday in January related merely to commissioners who had been appointed to fill vacancies, and after the appointment of the first three commissioners provided for in § 2 of the act. It is also quite clear from § 15 of the act that, as far as the commissioners first appointed were concerned, the legislature of 1913 had the whole of the session in which to act upon the confirmation. Section 1 of the act provides that "there is hereby created a state board to be designated and known as the tax commission." Section 2 of the act provides that "said tax commission shall be composed of three commissioners, who shall be appointed by the governor by and with the consent of the senate. Of such three persons, one shall be appointed and designated to serve for a term ending on the first Monday in May, 1915, one for a term ending on the first Monday in May, 1917, and one for a term ending on the first Monday in May, 1919, each of said terms to begin upon the qualification of the person appointed therefor;" while § 15 provides that "this act shall take effect July 1, 1912, and that the appointments shall not be made until after July 1, 1912, the same to be thereafter confirmed by the senate *in the legislative session of 1913.*" These are the clauses which relate to the original commissioners. The section (§ 3), on which respondent relies, relates only to vacancies occurring after the appointment of the first three commissioners and to future appointments. It provides: *"After the appointment of said first three commissioners, and except when appointed to fill a vacancy,* each commissioner shall be appointed on or before the last Monday in January, during the biennial session of the legislature next preceding the commencement of the term for which he shall be appointed. *In case of a vacancy,* it shall be filled by appointment by the governor for the unexpired portion of the term in which such vacancy shall occur, subject to confirmation by the senate. If *such* appointment be made when the legislature is not in regular session, the appointee shall hold his office until the third Monday in January in the next biennial session of the legislature, when if *such* appointment is not confirmed by the senate, the office shall become vacant." The word "such," which precedes the word "appointment," must refer back to the appointment made *in case of vacancy.* There is no other way in

which the section can be read without doing violence to all rules of construction and to the plain meaning of the English used by the legislature. There were no appointments to fill vacancies to be confirmed by the legislature of 1913, nor were there any "unexpired terms" to be filled. The only matter before the senate of 1913 was the confirmation of the appointments of the original commissioners, which § 15 provided could be confirmed "by the senate in the legislative session of 1913." This is certainly the construction that the legislature of 1913 gave to the act, and in our minds is the only logical construction of which it is capable.

The peremptory writ will issue as prayed for.